J-A16019-21

2021 PA Super 170

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| :--- | :--- | :--- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANDREW DULA, III | : | |
| | : | |
| Appellant | : | No. 1758 MDA 2019 |

Appeal from the Judgment of Sentence Entered June 14, 2019
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0002211-2016

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

OPINION BY McCAFFERY, J.:               **FILED SEPTEMBER 20, 2021**

Andrew Dula, III (Appellant), appeals from the judgment of sentence entered June 14, 2019, in the Luzerne County Court of Common Pleas, following his jury convictions of attempted involuntary deviate sexual intercourse (IDSI), institutional sexual assault,[1] and related crimes for his sexual abuse of a mentally and physically disabled woman in his care. Appellant argues the trial court erred in failing to strike a juror for cause, and abused its discretion by permitting testimony concerning primitive sounds and non-verbal conduct by the victim, a bruise on the victim, and Appellant's odd work behavior; denying a motion for a mistrial after the arresting officer stated he did not believe Appellant's denial of culpability; refusing to instruct the jury

---

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S. §§ 901, 3123(a)(5), 3124.2.

that the victim would not be called to testify because she lacked testimonial competency; and admitting Appellant's inculpatory statement in violation of the *corpus delicti* rule. For the reasons below, we affirm.

The facts, as developed during Appellant's jury trial, are summarized by the trial court, in its detailed 64-page opinion, as follows:

> [The victim, M.H.,] suffers from severe to profound mental retardation and severe spastic cerebral palsy. Because of these conditions, she is unable to speak, walk unassisted, or otherwise care for herself. [M.H.'s] mother, Donna Siene, provided for [her] needs in their home until [M.H.] reached the age of 21. Knowing that she would eventually be unable to care for her daughter, Mrs. Siene placed [M.H.] in the Community Living Arrangements residence (hereafter "the CLA") in Kingston, Pennsylvania, a residence home for persons with disabilities. During the time frame pertinent here, the CLA housed three residents, including [M.H.], who were cared for by residential program workers, including [Appellant], who was hired to work the 11:00 p.m. through 7:00 a.m. overnight shift Sundays through Thursdays.
>
> On February 2, 2016, [Appellant] and his coworker LaShanda Williams were working the overnight shift. When [Appellant] arrived at the CLA that evening, he entered the residents' bathroom and began grooming his hair while singing "I love you [M.] I love you [M.]" Ms. Williams heard [M.H.] start to whine as [Appellant] sang. When Ms. Williams asked [Appellant] what he was singing, [Appellant] told her he was using [M.H.'s] name with the lyrics of an old song.
>
> Later, during the early morning hours of February 3, 2016, while Ms. Williams was attending to another resident, she heard [M.H.] scream loudly — a sound that Ms. Williams had never heard [M.H.] make before. Ms. Williams left the other resident and ran to [M.H.'s] room. [M.H.'s] door, which was normally kept fully open, had been partially closed. When Ms. Williams pushed the door open she saw [Appellant] standing over [M.H.], who was lying sideways on her bed, naked from the waist down with her head hanging off the edge of the mattress and her legs in the air over [Appellant's] arms. [M.H.] appeared to be frantic and clawed for Ms. Williams, who sat on the bed and pulled [M.H.] to her.

- 2 -

[M.H.] whined and clung to Ms. Williams, but Ms. Williams was eventually able to put a diaper back on her and situate her in her bed. When Ms. Williams picked up the diaper [Appellant] had removed from [M.H.] to put it in the trash, she saw that the wetness indicator strip had not changed color and observed that the diaper did not feel wet or soiled.[1] When Ms. Williams attempted to leave the room and turn off the light, [M.H.] began whining again, so Ms. Williams left the light on and sat in a chair in the hall outside [M.H.'s] doorway. [M.H.] remained awake for the rest of the shift.[2] Appellant] did not re-enter [M.H.'s] room to check on her, did not talk to Ms. Williams as he normally would during their shifts, and did not fill out the half hour check chart. Instead, he spent the rest of the shift in the basement, only emerging to clock in at 3:00 a.m. and again at 5:00 a.m.[3]

_____

[1] The diapers worn by [M.H.] have an indicator strip that turns a different color when the diaper is wet and needs to be changed.

[2] LaShanda Williams had previously observed that [M.H.] was often not sleeping through the night on the nights that [Appellant] worked during the months preceding the February 3rd incident.

[3] Overnight shift employees were required to clock in at 12 a.m., 3 a.m. and 5 a.m. using the residence's telephone.

_____

Ms. Williams told [Appellant] that she was going to report [M.H.'s] scream, and documented it in the logbook.[4 Appellant] did **not** report the incident. To the contrary, his logbook entry for the night made no mention that [M.H.] screamed while he was in her room, but instead only indicated that [M.H.] was "a little whiny until about 1:30 a.m.," and stated that there were "no overnight issues."

_____

[4] The logbooks used at the CLA are similar to a journal, where staff record daily entries about each residence.

_____

Almost immediately after the 11:00 p.m. to 7:00 a.m. shift ended on February 3, 2016, [Appellant] exited the CLA, without alerting any of the incoming caregivers to [M.H.'s] scream, her subsequent agitation, or her wakefulness during the remainder of the night. [Appellant's] prompt departure was unlike his usual

- 3 -

habit of remaining inside the residence well beyond the end of his shift. Further, after exiting the residence on that morning, [Appellant] then sat for more than an hour in his car, parked next to the van used to transport the residents, finally leaving around 8:30 a.m. when staff needed to access to the van's handicap door. This was also not typical of [Appellant].

Meanwhile, LaShanda Williams remained with [M.H.] and told the incoming caregivers about the scream.[5] Although [M.H.] was normally eager to eat breakfast, on that morning she would not eat. Additionally, when [M.H.'s] clothes were changed, Ms. Williams noticed a mark on [M.H.'s] thigh that she hadn't seen before. Ms. Williams thought the mark looked like a thumb[print] and showed it to Yvonne Collins, one of the incoming caregivers. Jocelyn Robertson, another caregiver who had arrived for the 7:00 a.m. to 3:00 p.m. shift, also saw the mark and agreed that it looked like a thumbprint.

---

[5] Ms. Williams worked that shift, as well as the overnight shift she had just finished.

---

At that point, because of [M.H.'s] uncharacteristic scream, the position [M.H.] was in when Ms. Williams burst into her room after the scream, [M.H.'s] immediate attempts to get to Ms. Williams, her subsequent uncharacteristic demeanor and refusal to eat breakfast, the bruise on her thigh, [Appellant's] untruthful entry in the log book that there were "no overnight issues," his change in demeanor during the remainder of the shift, and his abrupt departure from the CLA at the end of the shift followed by his uncharacteristic lingering in the parking lot after he left the building, coupled with Ms. Williams' observations of the [Appellant's] interactions with [M.H.] and her reactions to [Appellant] leading up to the February 3rd incident, Ms. Williams had Yvonne Collins call Kimberly Sprau . . . , a program specialist with the Institute for Human Resources and Services (of which the CLA residence was part). Ms. Sprau then contacted her superior, Shani Williams, the residential program manager at the Institute for Human Resources and Services, who interviewed LaShanda Williams and directed her to fill out an incident report.

During LaShanda Williams' interview with Shani Williams, LaShanda Williams described what she observed during the February 2nd/February 3rd shift, as well as what she had observed

in the past with regard to [Appellant's] interactions with [M.H.] and [M.H.'s] reactions to [Appellant.[6]] These included her observations that [Appellant] removed [M.H.'s] diapers frequently, even when they were dry, and that he took an unnecessarily long time when he changed [her] diapers. Ms. Williams noted that [Appellant's] unnecessary diaper changes occurred during the night shift, when caregivers had been instructed to let the residents sleep. During the months leading up to the February 3rd incident in [M.H.'s] room, Ms. Williams observed that [M.H.] was often wakeful during the nights that [Appellant] worked. Ms. Williams noted that [Appellant] did not accurately record [M.H.'s] sleeplessness in the CLA logs, but instead often documented that [M.H.] was asleep when Ms. Williams had observed her to be awake. Ms. Williams did not observe [Appellant] making frequent unnecessary diaper changes of the other residents. Ms. Williams further observed that [M.H.] behaved differently when [Appellant] was present than she did when other caregivers, male or female, were present. Ms. Williams additionally observed that during the overnight shift when employees were instructed to do quick half hour checks on the sleeping residents, which could be accomplished by a peek into each room, [Appellant] would fully enter [M.H.'s] room, and spend as much time in [M.H.'s] room as Ms. Williams would take to check on both the other residents. Ms. Williams did not observe [Appellant] spending an inordinate amount of time with any of the other residents during half hour checks. Ms. Williams further explained that during the nights that she worked with [Appellant], including the February 2nd/3rd overnight shift when [M.H.] screamed, [Appellant] would arrive wearing pants, but would then go into the basement and emerge with cream colored long johns on, which he would wear for the remainder of the shift.

_____

[6] In doing so, LaShanda Williams also clarified to Shani Williams that the loud scream that [M.H.] had made was not a sound that LaShanda Williams was familiar with [M.H.] making, and further, that the diaper [Appellant] had taken off [M.H.] was dry.

_____

In addition to verbally reporting these observations to her superiors, the written statement provided by LaShanda Williams documented that [she] had observed [Appellant] work in his long johns, as he had done during the shift when [M.H.] screamed; observed that when she and [Appellant] worked together [he] appeared to have a "special attachment" to [M.H.] and would care

only for her, leaving Ms. Williams to care for the other two residents; observed that prior to the February 3rd incident, [Appellant] took dry diapers off [M.H.], and that during one particular previous shift she had observed [Appellant] take over ten minutes to change a dry diaper on [M.H.], even though he had been told that [her] diaper had just been changed by outgoing staff.

Based on the information received from LaShanda Williams, and the bruise observed on [M.H.'s] thigh, [M.H.] was taken to her primary care physician, Dr. Kara Brezinski-Clark, who did an external examination of her and observed the bruise.[7] At Dr. Brezinski-Clark's recommendation, [M.H.] was taken to the emergency room, where items and specimens were collected for a forensic examination evidence collection kit, and Dr. Brian Saracino performed a physical and gynecological examination.[8]

_____

[7] Dr. Brezinski-Clark observed that the bruise was "in the stages of healing," but could not determine when the bruise occurred.

[8] A forensic examination evidence collection kit, often referred to as a "rape kit[,]" is a product frequently used for the examination of sexual assault victims in which blood, hair, saliva, semen, fibers, and other substances are collected from the victim's body and clothing and retained for further examination.

_____

Dr. Saracino notified the Kingston Municipal Police Department that a sexual assault examination was performed on [M.H.] Kingston Police spoke to Kim Sprau, who relayed to them the events that led to the administration of the sexual assault examination, and they obtained records and documents pertaining to the day-to-day care of the CLA's residents and a photo of the bruise observed on [M.H.'s] thigh. Kingston Police also interviewed CLA employees LaShanda Williams, Tayna Gilroy, Jocelyn Robertson, and Shani Williams. Based on the information received, Kingston Police contacted [Appellant] and indicated that they were investigating an incident at the CLA, and [Appellant] agreed to come to Kingston Police Headquarters for an interview.

During the course of [his] interview, [on February 5, 2016, Appellant] confessed that he had exposed himself to [M.H.], put his fingers in her vagina, touched her breasts, masturbated while touching his penis to her thighs and vagina, and tried to put his

penis in her mouth on numerous occasions. [Appellant] denied ejaculating while with [M.H.], but admitted that numerous times after touching her, he . . . ejaculated in a sink in the basement. [Appellant] told police that he did these things between November 2015 and February 2016, with the last instance being the February 3rd incident.

Trial Ct. Op., 10/9/20, at 1-8 (some footnotes and all record citations omitted; paragraph break added).

On March 22, 2016, Appellant was charged with one count of institutional sexual assault. *See* 18 Pa.C.S. § 3124.2(a) ("a person who is an employee . . . of [a] mental health or mental retardation facility or institution commits a felony of the third degree when that person engages in . . . indecent contact with [a] resident"). However, nearly a year later, on March 20, 2017, the Commonwealth filed a petition seeking permission to amend the criminal information.[2] The court granted the petition, and, on April 8, 2017, the Commonwealth filed an amended information charging Appellant with the following crimes: criminal attempt to commit IDSI (count 1), criminal attempt to commit sexual assault (count 2), aggravated indecent assault without

_____

[2] The Commonwealth explained that it had entered into a "preliminary plea agreement" with Appellant in which it agreed to file only one count of institutional sexual assault in exchange for Appellant's guilty plea. *See* Commonwealth's Petition to Amend Criminal Information Upon Rejection of Preliminary Plea Agreement, 3/20/17, at 2 (unpaginated). The agreement further provided that if Appellant "in any way challenge[s his] arrest by pretrial motion or otherwise," the Commonwealth would have the right to add the additional charges to the criminal information. *See id*., Attachment A, Preliminary Hearing Plea Agreement, 3/22/16. Following a status conference conducted on March 27, 2017, the trial court determined Appellant did not wish to plead guilty, and granted the Commonwealth's motion to amend the information.

consent (count 3), aggravated indecent assault of complainant with mental disability (count 4), institutional sexual assault (count 5), indecent assault of complainant with mental disability (count 6), indecent assault without consent (count 7), and indecent exposure (count 8).[3]

The trial court summarized the ensuing procedural history as follows:

Defense counsel filed pre-trial motions, including a petition for writ of *habeas corpus*, a motion to have [M.H.] declared incompetent to testify at trial, a motion to compel a psychiatric examination of [M.H.], a motion to suppress [Appellant's] extra-judicial statements to police and a motion *in limine* seeking the preclusion of certain evidence/argument at trial[, including evidence regarding M.H.'s bruise and her primitive sounds and non-verbal behavior while in the vicinity of Appellant, and Appellant's odd behavior at work. **See** Appellant's Motion *in Limine*, 8/7/18, at 1-2]. Several hearings were conducted on these motions. The [trial c]ourt subsequently denied [Appellant's] petition for writ of *habeas corpus*, suppression motion, motion to compel a psychiatric examination, and motion *in limine*. The [c]ourt declined to rule on the testimonial competency of [M.H.] because the Commonwealth had indicated that it was not calling her as a witness.

[Appellant] asked the [c]ourt to reconsider his motion to have [M.H.] declared incompetent to testimony, indicating that, despite his earlier position that she is incompetent to testify at trial, he intended to call her as a defense witness. A hearing was held on August 21, 2018, during which the parties argued their positions, and the [c]ourt referenced the extensive expert testimony previously provided by defense witness, Dr. Richard Fischbein during a December 5, 2017 hearing on the defense motion to have [M.H.] declared incompetent to testify at trial.[FN] At the conclusion of the August 22, 2018 hearing, based on the evidence an expert testimony presented at the December 5th hearing, the [c]ourt ruled that [M.H.] was not competent to testify

_____

[3] **See** 18 Pa.C.S. §§ 901, 3124.1, 3125(a)(1), (a)(6), 3126(a)(1), (a)(6), 3127(a).

at trial. **In so ruling, the [c]ourt noted that such determination did not impact the admissibility of testimony from other witnesses regarding their observations of [M.H.]**

_____

[FN] In support of [Appellant's] motion . . . Dr. Fischbein explained that [M.H.] suffers from severe mental retardation, and opined that while she is capable of making sounds or physical actions to "draw attention" or "get attention," and can instinctively react if an event occurs that is painful to her, she is incapable of accurately perceiving the alleged incidents which are the subject of the charges against [Appellant], and could not be capable of remembering or truthfully recounting those events. On cross[-] examination, Dr. Fischbein clarified that [M.H.] is capable of feeling pain or fear, and capable of having instinctive, primitive reactions to things that cause fear, pain or stress. He further acknowledged that [M.H.] is capable of instinctive repetitive learning on a very simplistic level, such that although she would not be able to identify a voice as being that of her mother, she would be aware that it was a voice she recognized and, in that example, pleasant.

_____

After several continuance requests were granted, [Appellant's] jury trial eventually commenced on February 4, 2019. As evident from the history recited above, and as the parties made clear to the jury during their opening statement, no one saw [Appellant] abuse [M.H.], and because of her severe mental deficiencies, [M.H.] could not communicate anything that had been done to her. Although [Appellant] confessed to the abuse, the *corpus delecti* rule prevented introduction of the confession into evidence until after the Commonwealth proved, by a preponderance of the evidence, the *corpus* of the crime charged.[4] Consequently, the Commonwealth presented

_____

4 We will discuss the *corpus delicti* rule in greater detail **infra**. Essentially, it requires proof that a loss or injury occurred as a result of criminal conduct before a defendant's confession to a crime is admissible at trial. **See Commonwealth v. Young**, 904 A.2d 947, 956 (Pa. Super. 2006). A classic example of the rule is that if a defendant confesses to murder, before the confession is admitted at trial, the Commonwealth must prove the victim is,

*(Footnote Continued Next Page)*

extensive circumstantial evidence in support of the charges against [Appellant].

Trial Ct. Op. at 10-11 (record citations and some footnotes omitted; emphasis added).

This circumstantial evidence included testimony by other CLA caregivers that Appellant "attended to" and "interacted with" M.H. differently from how other caregivers attended to her, and from how Appellant interacted with the other residents. **See** Trial Ct. Op. at 12. Moreover, these other CLA caregivers also observed that M.H. "often exhibited certain verbal and non-verbal behaviors when [Appellant] was present that she did not exhibit in the presence of other caregivers[,]" such as turning her head away from him, whining "when she was in earshot of his voice," and, in one instance, making a screaming sound and grabbing for another caregiver when he entered her room. **Id.** at 13. They also described the process they used to change M.H.'s diaper, which "did not require stripping her naked from the waist down and holding her legs in the air." **Id.** at 14. Furthermore, at trial, Ms. Williams testified that when she asked Appellant about M.H.'s screaming and whining, he replied:

> [M.H.] was acting weird and that he didn't know why she was acting like that. And he had told me that maybe she needed to get a pap smear and he asked me [if they were] going to go in her.

_____

in fact, dead, and their death was the result of the commission of a crime. **See Commonwealth v. Ware**, 329 A.2d 258, 274 (Pa. 1974).

N.T. Jury Trial, 2/6/19, at 817.[5]

On February 14, 2019, the jury returned a verdict of guilty on all charges. Appellant proceeded to sentencing on June 14, 2019. At that time, the trial court imposed an aggregate term of 111 to 228 months' imprisonment, followed by two years' probation.[6] Appellant filed a timely post-sentence motion, which the trial court denied on October 16, 2019. This timely appeal follows.[7]

Appellant raises six issues, with sub-claims, on appeal:

1. Was Prospective Juror #23 impliedly biased because she had a close situational relationship with the victim and was therefore subject to removal for cause?

   [a.]     Does the unwarranted exercise of a preemptory challenge due to a [t]rial [c]ourt's error in failing to strike a

---

[5] Although the jury trial lasted more than a week, the trial transcript is consecutively paginated, and lists only the commencement date, February 6, 2019, on the cover page. Thus, we will refer to this transcript as "Jury Trial."

[6] Prior to sentencing, the trial court directed that Appellant undergo an assessment by the Sexual Offender Assessment Board. *See* Order, 2/20/19; 42 Pa.C.S. § 9799.24(a) ("After conviction but before sentencing, a court shall order an individual convicted of a sexually violent offense to be assessed by the board."). The Board determined that Appellant did not meet the criteria for classification as a sexually violent predator pursuant to the Sexual Offender Registration and Notification Act (SORNA), 42 Pa.C.S. §§ 9799.10-9799.42. *See* N.T., 6/14/19, at 6. As a Tier III offender, however, Appellant is required to register as a sexual offender for his lifetime. *See id.* at 17; 42 Pa.C.S. §§ 9799.14(d) (Tier III sexual offenses include aggravated indecent assault), 9799.15(a)(3) (Tier III offender must register for lifetime).

[7] After requesting, and being granted, an extension of time, Appellant complied with the trial court's directive to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

juror for cause violate Article I, Section 9 of the Pennsylvania Constitution?

2. Did the [t]rial [c]ourt abuse its discretion by admitting into evidence: (i) the out-of-court whines, cries, screams, moans and other non-verbal conduct of M.H., who as the alleged victim lacked testimonial capacity; and (ii) testimony about a "bruise" found on M.H.'s body that was not caused by a physical or sexual assault?

[a.] Does evidence of the out-of-court whines, cries, screams, moans and other non-verbal conduct of M.H. satisfy a hearsay exception?

[b.] Does the admission into evidence of the out-of-court whines, cries, screams, moans and other non-verbal conduct of M.H. and the bruise found on M.H.'s body constitute harmless error?

3. Did the [t]rial [c]ourt admit, over [Appellant's] objection, his work behavior as [Pa.R.E.] 404(b) evidence, and if so, did the [c]ourt err in denying [Appellant's] objection to its refusal to give a limiting instruction and his point for charge? Alternatively, if admitted as substantive evidence was [Appellant] denied due process and was this evidence unduly prejudicial to him pursuant to Pa.R.E. 403?

4. Did the [t]rial [c]ourt err in denying [Appellant's] motion for a mistrial made in response to opinion testimony from the arresting police officer that he did not believe [Appellant's] repeated denials that he sexually assaulted M.H.?

5. Did the [t]rial [c]ourt abuse its discretion by refusing to instruct the jury on M.H.'s lack of testimonial capacity?

6. Did the [t]rial [c]ourt abuse its discretion by admitting into evidence [Appellant's] inculpatory statements in violation of the *corpus delicti* rule?

[a.] Was the evidence sufficient to prove beyond a reasonable doubt the *corpus delicti* of each crime for which [Appellant] was convicted?

Appellant's Brief at 3-5.[8]

In his first issue, Appellant contends the trial court erred when it refused to strike prospective Juror #23 for cause, after the juror revealed during *voir dire* that she had been the victim of an indecent assault when she was 13 years old. **See** Appellant's Brief at 23. Appellant insists this fact alone demonstrated the prospective juror had a "close situational relationship with the victim," which required the court to presume she would be prejudiced, "regardless of actual partiality," and excuse her for cause. **Id.** at 20. He further maintains that he preserved this claim by "exercising a peremptory challenge striking prospective Juror #23 and then exhausting his peremptory challenges prior to the seating of the jury." **Id.** at 27.

By way of background, prior to individual *voir dire*, the trial court asked the members of the jury panel to stand if, *inter alia*, they or any member of their family had been a victim of a crime. **See** N.T., 2/4/19, at 20-21.

---

[8] We have reordered Appellant's claims for ease of disposition. We note, too, Appellant raised an illegal sentencing claim in his Rule 1925(b) statement that he does not address in his brief. Specifically, he argued "[t]he sentence imposed on Count 6 is illegal because it should have merged with Count 5 for sentencing purposes." Appellant's Concise Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925, 1/20/20, at 6 (unpaginated). Acknowledging that an illegal sentencing claim cannot be waived, we conclude that even if Appellant addressed this claim in his brief, we would rest upon the trial court's ruling outlined in its opinion. **See** Trial Ct. Op. at 62-64 (finding sentencing for institutional sexual assault and indecent assault of victim with mental disability did not merge because (1) the acts charged occurred on more than one occasion and (2) not all the statutory elements of one offense were included in the other offense). **See also** 42 Pa.C.S. § 9765.

Prospective Juror #23 stood at that time. *Id.* During individual *voir dire*, the court asked prospective Juror #23 why she responded affirmatively. *See id.* at 127-28. She stated: "When I was 13 I was a victim of an indecent assault, corruption of minor." *Id.* at 128. The court continued to question the prospective juror as follows:

> THE COURT: Would there be anything about that circumstance that would cause you to feel in any way that you could not be a fair and impartial juror if selected in this case?
>
> PROSPECTIVE JUROR NO. 23: I think I could be fair. Honestly, yesterday I didn't respond to any emotionally – that I couldn't handle it. I broke down three times before I even came this morning. It's just difficult. I don't know how you do it. I have ultimate respect for everybody here.
>
> THE COURT: Again, the allegations might seem uncomfortable and unpleasant with what's alleged in this case. I guess what we're look for and doing is, if you were selected as a juror, would you be able to decide the case based on the testimony and evidence presented in the courtroom and the law that I would instruct the jury on and setting aside any outside influences or biases or sympathies or emotions or things of that nature?
>
> PROSPECTIVE JUROR NO. 23: I could do that, yes.

*Id.*

At that time, Appellant's counsel moved for a sidebar and requested the court strike the prospective juror for cause, noting that the day before, "we had a prospective juror . . . who was also the victim of the exact same crime, and that juror was excused for cause." N.T., 2/4/19, at 129-30. The Commonwealth responded that the other prospective juror "very clearly said she could not set aside what had happened to her and listen to the case

- 14 -

clearly, the exact opposite of what [prospective Juror #23] is saying."[9] *Id.* at 130. The trial court denied Appellant's request to excuse the juror for cause. Appellant's counsel proceeded to question the prospective juror, who again stated that she thought she could be fair and had no "substantial doubts as to whether [she] could put [her] experience aside." *Id.* at 134. Counsel again moved to dismiss the prospective juror for cause, and the trial court denied that request. *See id.* at 138. Appellant later used a peremptory challenge to strike prospective Juror #23 from the panel. *See* Jury Panel at 1 (unpaginated).

In *Shinal v. Toms*, 162 A.3d 429 (Pa. 2017), the Pennsylvania Supreme Court explained that appellate review of a trial court's refusal to strike a prospective juror for cause depends upon the underlying basis for which the disqualification is sought. *See id.* at 441. The Court recognized that in some cases, "the relationship [of the prospective juror to the parties, counsel, victims or witnesses] is sufficiently close that we presume the likelihood of prejudice[.]" *Id.* However, in other cases, a party may seek

_____

[9] Indeed, the record reveals that the trial court also question prospective Juror #15 why she responded that she or someone she knew had been a victim or witness to a crime. *See* N.T., 2/4/19, at 96. She responded, "I was actually a victim to abuse." *Id.* The court then asked her: "Would that circumstance cause you to feel in any way that you could not be fair and impartial if selected in this case?" *Id.* Prospective Juror #15 replied, "Yes." *Id.* Further, when the court inquired it if was something she would be able to set aside, she plainly stated: "No. Definitely not." *Id.* The court then excused prospective Juror #15 for cause "based on the agreement of the parties." *Id.*

- 15 -

disqualification after "the juror reveals a likelihood of prejudice through conduct and answers to questions[.]" *Id.*

> In the first scenario, we will presume prejudice for the purpose of ensuring fairness and will review the trial court's determination for an error of law. Our review of a question of law is *de novo*, and the scope of our review is plenary
>
> In the second scenario, where the juror's conduct or answers to questions reveal a likelihood of prejudice, we agree with the Superior Court that "much depends upon the answers and demeanor of the potential juror as observed by the trial judge and, therefore, reversal is appropriate only in the case of palpable error." We defer to the trial judge because it is he or she that observes the juror's conduct and hears the juror's answers:
>
> > [T]he juror appears before [the trial judge, who] sees him and hears what is said; and is able to form his opinion as much from the proposed juror's conduct as from the words which he utters, printed in the record. Hesitation, doubt, and nervousness indicating an unsettled frame of mind, with other matters, within the judge's view and hearing, but which it is impossible to place in the record, must be considered. As it is not possible to bring these matters to our attention, the trial judge's view should be given great weight in determining the matters before him.

*Id.* at 441-42 (citations and footnotes omitted). Nonetheless, the *Shinal* Court recognized that "even in the context of presumed prejudice, the trial court retains discretion to explore and assess the relevant relationship presented." *Id.* at 442.

Here, Appellant insists that, based solely on the fact prospective Juror #23 disclosed she was the victim of an indecent assault when she was 13 years old, the prospective juror had such a "close **situational** relationship" with the victim that the trial court should have presumed prejudice and removed her for cause absent further questioning. *See* Appellant's Brief at

- 16 -

24 (emphasis added). Relying on decisions of the federal appeals court, Appellant maintains "the standard for implied bias is an 'objective one' so that 'a juror must be recused even where the juror affirmative asserts (or even believes) that he or she can and will be impartial." ***Id.*** at 22, 24 *citing* ***U.S. v. Gonzales***, 214 F.3d 1109 (9th Cir. 2000); ***U.S. v. Mitchell***, 690 F.3d 137 (3rd Cir. 2012).[10] He further argues the trial court "was required to focus on the impact of the victimization on Juror #23 and whether that impact had dissipated," rather than the prospective juror's subjective assessment of her own impartiality. Appellant's Brief at 24.

The trial court rejected this claim as follows:

> Here, prospective [J]uror [#]23's answers during *voir dire* initially indicated that at the age of thirteen, she was the victim of an indecent assault, thus raising a question as to whether she had a situational relationship to the victim in this case. In order to determine whether prospective [J]uror [#]23 should be deemed to have such a close situational relationship with the victim as to require prejudice to be **presumed**, the [c]ourt explored and assessed the relationship to determine if the prospective juror's situational similarity to the victim impacted her ability to be a fair and impartial juror, to decide the case based on the testimony and evidence presented and the law as instructed by the Court , and to set aside any outside influences, biases, sympathies and emotions. Based on prospective [J]uror [#]23's unequivocal indication to the [c]ourt that she was certain that she would be fair and impartial, that she would decide the case based on the testimony and evidence presented and the law as instructed by

---

[10] Appellant's reliance of decisions of the federal appeals courts is misplaced. "Absent a United States Supreme Court pronouncement, decisions of federal courts are not binding on state courts, even when a federal question is involved." ***Commonwealht v. Lambert***, 765 A.2d 306, 315 n.4 (Pa. Super. 2000).

- 17 -

> the [c]ourt, and that she could set aside any outside influences, biases, sympathies and emotions, this [c]ourt concluded that there was not such a close situational relationship with he victim in the case at hand to require the [c]ourt to presume prejudice. As such, [Appellant's] initial motion to strike prospective [J]uror [#]23 for cause based on presumed prejudice was denied.

Trial Ct. Op. at 23-24 (citations omitted).

We agree with the ruling of the trial court that prospective Juror #23 did not demonstrate such a "close situational relationship" with the victim that she should have been dismissed for cause. When prospective Juror #23 revealed she was the victim of an indecent assault at age 13, the trial court appropriately inquired if "that circumstance" would affect her ability to be a fair and impartial juror. *See* N.T., 2/4/19, at 128. While she initially responded, "I think I could be fair[,]" and stated she had not responded emotionally to the case the day before, she also explained that she "broke down three times" before court that morning. *Id.* However, the court then inquired whether she could put aside any outside influences or biases, and decide the case based solely on the testimony presented. *See id.* Prospective Juror #23 replied, without any equivocation, "I could do that, yes. . . . For sure." *Id.* Moreover, upon further questioning by Appellant's counsel, prospective Juror #23 explained her abuser was arrested and pled guilty, so she did not have to "get on the stand." *See id.* at 132. She also admitted that while the incident "weighed on [her,]" she never sought therapy. *See id.* at 132-33. Further, she repeated, twice, that she believed she could be fair, and stated she had **no** substantial doubts as to whether she could "put her experience aside." *See id.* at 133-34.

Accordingly, we detect no error or abuse of discretion in the court's ruling. None of the cases cited by Appellant propose a *per se* finding of a "close situational relationship" based **solely** on the fact a prospective juror was the victim of a similar crime many years earlier.[11] Accordingly, we conclude the trial court did not err as a matter of law in determining the prospective juror's situational relationship with the victim was not "sufficiently close" that the court was required to presume prejudice. **See Shinal**, 162 A.3d at 441. Furthermore, we also detect no abuse of discretion on the part of the trial court in determining prospective Juror #23's responses during *voir dire*, did not reveal a "likelihood of prejudice." **See id.** Thus, his first claim fails.[12]

In his next two issues, Appellant challenges the trial court's admission of certain evidence at trial — specifically, M.H.'s primitive sounds and non-verbal reactions to Appellant, the bruise observed on M.H.'s thigh, and testimony concerning Appellant's odd behavior at work. Our standard of review concerning evidentiary rulings is well-established:

> [The a]dmission of evidence is within the sound discretion of the
> trial court and will be reversed only upon a showing that the trial

---

[11] The record does not reveal prospective Juror #23's age at the time of trial.

[12] Because we conclude the trial court did not err or abuse its discretion when it denied Appellant's motion to remove prospective Juror #23 for cause, we need not address Appellant's related claim that an appellant need to "show actual prejudice by having an incompetent juror forced upon him" in order to obtain relief for an implied bias claim under the Pennsylvania Constitution. **See** Appellant's Brief at 26-27.

court clearly abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Radecki***, 180 A.3d 441, 451 (Pa. Super. 2018) (citation omitted).

The Pennsylvania Rules of Evidence provide the following guidelines for determining the admissibility of evidence. "All relevant evidence is admissible" at trial. Pa.R.E. 402. Evidence is considered relevant if two conditions are met: "(a) [the evidence] has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401(a)-(b). Nevertheless, a trial court "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. We emphasize:

> Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would
>
> > inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. As this Court has noted, a trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which a defendant is charged.

***Commonwealth v. Danzey***, 210 A.3d 333, 342 (Pa. Super. 2019) (citation omitted), *appeal denied*, 219 A.3d 597 (Pa. 2019).

Hearsay testimony is an out of court statement by a declarant, which is introduced into evidence to prove the truth of the matter asserted in the statement. Pa.R.E. 801(c)(1)-(2). While the "statement" may be oral, written or nonverbal conduct, it must be intended as an assertion by the declarant. Pa.R.E. 801(a). An "assertion" is defined as "[a] declaration or allegation [made] with the intent of expressing a fact or opinion[.]" Black's Law Dictionary (11th ed. 2019), "Assertion." Hearsay testimony is inadmissible unless it meets an exception provided in the rules. Pa.R.E. 802. With this background in mind, we consider Appellant's specific claims on appeal.

First, Appellant contends the trial court abused its discretion in denying his motion *in limine* to preclude "evidence of observations made by M.H.'s caregivers of her whines, cries, shouts, whimpers and other non-verbal conduct that occurred in the presence or vicinity of" Appellant. Appellant's Brief at 28; Appellant's Motion *in Limine*, 8/7/18, at 2. He maintains the trial court "incorrectly concluded M.H.'s primitive sounds and conduct were relevant and admissible as mere non-hearsay reactions to stimuli despite her lack of testimonial competency." Appellant's Brief at 28-29. Appellant's argument is two-fold: he asserts the court abused its discretion in ruling the evidence was (1) relevant, and (2) non-hearsay.

With regard to relevance, Appellant argues M.H.'s non-verbal reactions to Appellant are irrelevant and "of no consequence in determining this case," unless they constitute an "implied assertion that M.H. believes [Appellant] sexually assaulted her." Appellant's Brief at 29. However, Appellant insists

that is not possible because the trial court ruled M.H. was incompetent to testify, and "could not . . . perceive and remember events accurately nor could she accurately and truthfully communicate her perceptions to others." *Id.* at 30. Thus, Appellant argues, "the jury could be misled into drawing an unreasonable inference that M.H. was fearful of [Appellant] **because** she cognitively understood that he sexually assaulted her." *Id.* (emphasis added). Moreover, Appellant contends "[a]ny probative value of [this evidence] was far outweighed by the unfair prejudice to [Appellant of] misleading the jury as to M.H.'s cognitive ability to accurately perceive and remember events and to accurately and truthfully communicate her perceptions through primitive sounds and conduct." *Id.* at 29.

Appellant further argues that M.H.'s "implied assertions" constitute hearsay testimony, not subject to any of the hearsay exceptions. *See* Appellant's Brief at 35-36. Although he acknowledges M.H. may not have intended her primitive sounds to constitute an assertion, he insists the Commonwealth offered the testimony for that purpose. *See id.* at 35. Appellant further explains M.H.'s purported reactions to him do not fall under the present sense impression, excited utterance, or state of mind exceptions to the hearsay rule. *Id.* at 36-37; s*ee* Pa.R.E. 803(1)-(3). Appellant summarizes:

> M.H.'s "reactions" to [Appellant's] voice or demeanor would have no relevance unless these "reactions" stem from M.H.'s understanding and recollection that [Appellant] sexually assaulted her — in which case the "reaction" is a statement or assertion of fact and therefore, inadmissible hearsay.

- 22 -

Appellant's Reply Brief at 10.

The evidence which Appellant contests is testimony by M.H.'s caregivers that M.H. responded negatively toward Appellant. LaShanda Williams, who reported the suspected abuse, testified that she observed M.H. "go 'Eggh'" and "whine" when she heard Appellant's voice.[13] N.T., Jury Trial, at 387. She further testified that she never heard M.H. make that noise, or react negatively, to other people in the house. *See id.* at 388-90. Jocelyn Robertson, another coworker, testified that she noticed M.H. would "move away" from Appellant when she would see him. *Id.* at 214. She described one incident when she was in M.H.'s room to give her medication, and Appellant entered to inform Robertson he had already given M.H. her medication. *See id.* at 212-214. Robertson testified that, as soon as Appellant entered the room, M.H. "went from the middle of her bed to the side of her bed and started grabbing for [Robertson] so bad [that] she scratched [Robertson's] neck." *Id.* at 213. Robertson described M.H. as "crying, but she was like kind of moaning, like really scared." *Id.*

In rejecting Appellant's claim, the trial court found M.H.'s "actions and demeanor were relevant as part of the body of circumstantial evidence forming the factual underpinning of this case, and [that] the probative value of this evidence was not outweighed by the potential of unfair prejudice to"

_____

[13] Williams stated she even joked with Appellant that M.H. "hates [his] voice." N.T., Jury Trial, at 388.

Appellant. Trial Ct. Op. at 40-41. Although the court acknowledged it declared

M.H. incompetent to testify at trial, it explained:

> [M.H.'s] inability "to perceive any event accurately" is not pertinent to the admissibility of evidence presented through the testimony of her caregivers that they observed her making various sounds and exhibiting various behaviors. The relevance of their testimony did not depend on whether [M.H.] could accurately perceive an event, but was instead intended, and properly admitted, as conveying their own observations of her physical condition and appearance. . . . ***Commonwealth v. Counterman***, [719 A.2d 284, 301 (Pa. 1998)] ("A lay witness may testify to distinct facts observed concerning the apparent physical condition or appearance of another.") . . . Once presented with this testimony, the jury was then tasked with making reasonable inferences from it.

***Id.*** at 42-43 (some citations omitted).

We agree with the trial court's reasoning. Preliminarily, we note that at the competency hearing, Dr. Fischbein — Appellant's expert — testified that, based on his review of her records, M.H. functioned at the level of an eight and one-half-month-old child.[14] N.T., 12/5/17, at 40, 47, 75. Moreover, while Dr. Fischbein explained M.H. did not have the capacity to "accurately perceive" or "recount" an incident of sexual assault, he acknowledged she could exhibit "an instinctive reaction to being uncomfortable, in pain." ***Id.*** at 49, 76. He further explained M.H.'s cries and grunts are her way of "letting the caregiver

---

[14] Dr. Fischbein acknowledged that M.H.'s family physician reported M.H. has the "functional capabilities of a two-year-old child." N.T., 12/5/17, at 71. He stated, however, that he believed that was "inaccurate" and that M.H.'s level of functioning was "much lower." ***Id.*** We note, too, M.H.'s mother testified that she believed M.H. had the capacity of a three-year-old child. N.T., Jury Trial, at 51.

know something isn't right, but it surely isn't going to tell them what is wrong or what's causing it. They then have to go on an exploration of looking for . . . what's causing it[.]" *Id.* at 63. Indeed, at trial, M.H.'s mother and caregivers testified that M.H. could communicate her likes and dislikes through primitive sounds and non-verbal behavior. *See* N.T., Jury Trial, at 45-48 (testimony of M.H.'s mother that M.H. would turn her head if she did not like the food she was given; would pull away and make a "Grr" sound when her nails were clipped; and could comply with simple commands), 170, 178 (testimony of Robertson that M.H. would giggle when she was fed or playing with her toys), 345-46, 351, 355 (testimony of Williams that M.H. would smile and say "Dit, dit dit, dit" when playing peek-a-boo or when she was excited, but "would be frantic" and pull away when she had to take a shower). Furthermore, although the trial court determined M.H. was incompetent to **testify** at trial, it explicitly stated that its ruling did not apply to the testimony of other witnesses regarding their observations of M.H. *See* N.T., 8/21/18, at 13.

Here, no witnesses testified that M.H. responded negatively toward Appellant because she **knew** he sexually abused her. Rather, the testimony was offered to show M.H. responded differently, and consistently negatively, toward Appellant when she did not do so toward her other caregivers. This testimony made it more probable that M.H. did not like, or was uncomfortable, around Appellant. We agree that where, as here, Appellant is accused of sexually abusing a mentally disabled, non-verbal victim, evidence of the victim's negative reaction to Appellant is relevant to determining the victim's

- 25 -

state of mind. *See Commonwealth v. Patosky*, 656 A.2d 499, 502, 505 (Pa. Super. 1995) (testimony that victim, who had been sexually assaulted by coworker, was "extremely distraught and . . . extremely nervous" when she reported incident to supervisor two months after assault was relevant to explain victim's failure to file prompt complaint).

Moreover, we also agree that the prejudicial impact of this evidence does not outweigh its probative value. As noted above, none of the witnesses testified M.H. reacted negatively toward Appellant because she **knew** he had sexually assaulted her. Even the Commonwealth acknowledged during its closing argument that M.H. "can't possibly understand the concept of sexual contact." N.T., Jury Trial, at 985. Rather, the Commonwealth asked the jury to consider M.H.'s consistent negative reaction to Appellant as a "red flag" which, in combination with the other circumstantial evidence, proved beyond a reasonable doubt that Appellant sexually assaulted M.H. *See id.* at 1001, 1014. Thus, contrary to Appellant's characterization, the purpose of this testimony was not to "mislead[ ] the jury as to M.H.'s cognitive ability[.]" *See* Appellant's Brief at 29. Accordingly, Appellant's relevancy argument fails. *See Radecki*, 180 A.3d at 451.

We also agree with the trial court's conclusion that testimony concerning M.H.'s primitive noises and non-verbal behavior directed toward Appellant does not constitute hearsay. As explained *supra*, the rule against hearsay applies only to statements, which include oral, written or non-verbal conduct, but only if the person making the "statement" intended it as an "assertion."

*See* Pa.R.E. 801(a), (c). Here, there is no dispute M.H. was incapable of making assertions, that is, a declaration made "with the intent of expressing a fact or opinion." *See* Black's Law Dictionary, "Assertion."

Relying on ***Commonwealth v. Parker***, 104 A.3d 17 (Pa. Super. 2014), Appellant insists M.H.'s primitive sounds and non-verbal behavior constitute "'[i]mplied assertions'[, which] have long been recognized in Pennsylvania as statements subject to the hearsay rules." Appellant's Brief at 35. Further, he maintains "the purpose for which the statement is offered is determinative" of the admissibility of the statement, not the intent of the declarant. ***Id.*** Appellant's reliance on ***Parker*** is misplaced.

In that case, this Court held that "a **question** can be hearsay if it contains an implied assertion offered for the truth of the matter[, and] that the substance of an utterance, not its grammatical form, controls whether the utterance is admissible." ***Parker***, 104 A.3d at 24 (emphasis supplied). Shortly before he was killed, the victim in ***Parker*** called his grandmother and, according to her testimony, "asked her to 'tell Bey[, presumably the killer,] that he had been in the house all day' and to tell Bey that 'he didn't take anything from anybody and doesn't have anything.'" ***Id.*** at 19. We concluded that, "when a question includes an implied assertion, the question constitutes a statement for the purpose of Rule 801(a)." ***Id.*** at 24. We further held: "**If that statement is offered for the truth of the matter asserted**, it is hearsay and is generally inadmissible." ***Id.*** (emphasis added). Appellant relies on the second holding (regarding how the statement is offered into

evidence), without reference to the first — that is, a determination of whether M.H.'s noises and non-verbal conduct constitute "statements" under the Rule. Because a statement must be an "assertion" by the declarant, and M.H. cannot make an assertion, the second holding in **Parker** is irrelevant for our purposes.

Accordingly, we conclude the trial court did not abuse its discretion in concluding M.H.'s primitive sounds and non-verbal conduct were not hearsay. **See Radecki**, 180 A.3d at 451. Thus, Appellant's challenge to this testimony fails.

Appellant also argues the trial court abused its discretion when it admitted evidence of the thumbprint-shaped bruise observed on M.H.'s thigh after the February 3rd incident.[15] Appellant's Brief at 38; N.T., Jury Trial at 223, 442-44. He maintains the evidence did not have any probative value, and, even if it did, "the probative value did not outweigh the unfair prejudice to [Appellant] pursuant to Pa.R.E. 403." Appellant's Brief at 39. Appellant explains the court admitted testimony concerning the discovery of the bruise as "a factor that led Williams to report the incident that occurred" on February 3rd. **Id.** However, he insists the fact that the Commonwealth presented "several other factors that established why Williams reported the incident[,] negates the probative value of the . . . bruise." **Id.** Additionally, because

---

[15] We note Appellant preserved this issue by seeking to preclude testimony concerning the bruise in his motion *in limine*. **See** Appellant's Motion *in Limine* at 1.

M.H. had a history of unexplained bruises, and Dr. Saracino found no physical evidence of abuse — even considering the bruise — Appellant asserts the evidence permitted the jury to draw an unreasonable inference that the bruise was the result of a sexual assault. *Id.* at 39-40.

Here, the trial court found testimony concerning the unexplained bruise observed on M.H.'s thigh the morning after the February 3rd incident was relevant and admissible. *See* Trial Ct. Op. at 45-46. The court opined:

> LaShanda Williams testified that she observed the bruise on [M.H.'s] thigh on the morning of February 3rd, after the scream incident, and that she had not observed the bruise there prior to the scream incident. Ms. Williams further testified that attempts to ascertain if the bruise had been caused by something prior to the scream incident did not reveal any separate cause. Ms. Williams testified that the existence of the bruise was one of the circumstances that led her to report the February 3rd incident in the manner that she did so. Dr. Saracino testified that he observed the bruise, and explained that while its existence, alone, did not lead him to conclude [M.H.] was being abused, the bruise could have been caused by the pressure of a fingertip on [M.H.'s] thigh, and her physical examination as a whole did not rule out the possibility of sexual abuse. This Court appropriately concluded that the testimony was relevant, and further, that the probative value of this testimony, when viewed as part of the evidence as a whole, was not outweighed by a danger that such evidence would cause the jury to come to a decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially. . . .

*Id.* (record citations omitted).

We detect no abuse of discretion on the part of the trial court. Williams' observation, of the thumbprint-shaped bruise on M.H.'s upper thigh after the incident the night before, was one of the factors that led Williams to report the incident to her supervisor. *See* N.T., Jury Trial, at 444-46, 588. Although

she could not state how or when M.H. sustained the bruise, Williams explained that she did not notice the bruise on the afternoon of February 2nd when she helped M.H. on the toilet after daycare. *See id.* at 529-31. Appellant's arguments — that M.H. had a history of bruising, and the rape examination uncovered no obvious, physical signs of sexual assault — address the weight to be given this evidence, not its admissibility. Thus, this claim, too, warrants no relief.[16] *See Radecki*, 180 A.3d at 451.

Appellant's next issue also challenges the court's admission of evidence, specifically testimony concerning Appellant's odd behavior at work. *See* Appellant's Brief at 46. He argues the trial court abused its discretion in admitting this testimony as evidence of his prior bad acts, pursuant to Pa.R.E. 404(b),[17] and in failing to provide the jury with a limiting instruction as to how to evaluate this testimony. *See id.* at 46-50. Further, to the extent the court now contends it admitted the testimony as substantive evidence, Appellant maintains he was "palpably misled" by the court's ruling at trial, and, in any

---

[16] Because we conclude the trial court did not err or abuse its discretion in admitting evidence of M.H.'s primitive sounds and non-verbal behavior or the bruise observed on her thigh, we need to address Appellant's argument that the admission of this evidence was not harmless error. *See* Appellant's Brief at 40-41.

[17] Pennsylvania Rule of Evidence 404(b) prohibits the introduction of evidence of a person's crimes or bad acts "in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, the Rule permits such evidence if it is relevant for another purpose "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2).

event, the prejudicial impact of the evidence outweighed its probative value. *See id.* at 47 n.32, 50.

By way of background, we note that, in his motion *in limine*, Appellant sought to preclude testimony concerning his odd work behavior because as irrelevant, and because "its probative value will create an unfair prejudice[.]" Appellant's Motion *in Limine*, 1-2. Specifically, Appellant stated the evidence would "allow the jury to unreasonably infer (speculate) that because [Appellant] was perceived as odd or weird that he therefore sexually assaulted the alleged victim." *Id.* at 2. The court denied the motion *in limine* in its entirety. *See* Order, 1/25/19. Subsequently, on the morning of jury selection, the Commonwealth filed a notice of its intent to introduce testimony of Appellant's odd work behavior as "other bad acts" evidence pursuant to Pa.R.E. 404(b)(1)-(2). Commonwealth's Notice of Intent to Introduce Other Bad Acts Pursuant to [Pa.R.E.] 404(b), 2/4/19, at 1-2 (unpaginated). It specifically noted it submitted the motion "to supplement the record with **additional reasons** as to why this evidence is admissible." *Id.* at 2 (emphasis added).

Prior to jury selection, Appellant's counsel objected, arguing that Appellant's odd work behavior did not constitute "bad acts" as contemplated in the Rule. *See* N.T., 2/4/19, at 2-9. In response, the Commonwealth acknowledged that the motion did not "necessarily" have to be filed, but rather it was just "supplementing the record." *Id.* at 3. At the conclusion of argument, the trial court stated, "I think I've already ruled and I'd rule again

- 31 -

that the evidence purported to be admitted at this point is admissible." **Id.** at 9.  The court explained:  "[I]t's admissible because it's relevant . . . as to motive, opportunity, intent, preparation, plan, knowledge, identity, and all of those things, and I feel that its probative value would outweigh its potential for unfair prejudice." **Id.** at 9-10.  When Appellant's counsel further argued that the testimony does not concern prior **bad acts**, the court responded:  "If it's not a bad act, then we don't even get to this analysis . . . so it comes in if it's relevant." **Id.** at 10.

In its Rule 1925(a) opinion, the trial court clarified that it admitted the testimony as relevant, circumstantial evidence of Appellant's guilt, which "had probative value [that] was not outweighed by the danger of undue prejudice." Trial Ct. Op. at 31.  In fact, the court agreed that Appellant's "actions were not prior, unrelated bad acts, but contemporaneous and related to the charged crimes[.]" **Id.** at 38.  Further, the court stated:  "The record reflects that such evidence was not admitted as prior bad act evidence under Rule 404(b)." **Id.** at 37.  We agree.

By the time the Commonwealth filed its "supplemental" Rule 404(b) notice, the court had already determined evidence of Appellant's odd work behavior was relevant and admissible as evident by its denial of Appellant's motion *in limine*.  Our review of the on-the-record Rule 404(b) discussion reveals the trial court believed any ruling on the Commonwealth's belated notice was immaterial.  **See** N.T., 2/4/19, at 10 (trial court stating to Appellant's counsel, "If you're right, [and Appellant's work behaviors are not

bad acts], we don't get to that analysis, so it comes in if it's relevant."). Thus, because the trial court did not admit this testimony as prior bad acts pursuant to Rule 404(b), we need not address Appellant's claims that such admission was incorrect, or that the court erred in refusing to provide a Rule 404(b) jury instruction.

The argument in Appellant's brief focuses primarily on his assertion that the court abused its discretion in admitting this evidence pursuant to Rule 404(b) — a contention which we have refuted above. **See** Appellant's Brief at 46-50. In fact, his only objection to the court's admission of this testimony as **substantive** evidence is in a footnote, which states, in *toto*:

> Assuming this Court concludes . . . this evidence was not admitted as bad act evidence but as substantive evidence, [Appellant] nevertheless argues that this evidence should never have been admitted as substantive evidence, pursuant to Pa.R.E. 402 and 403, because the admission of this evidence allowed the jury to unreasonably and prejudicially infer from his behavior that he acted in accordance therewith by sexually assaulting M.H. thereby outweighing any probative value.

*Id.* at 47 n. 32. Because Appellant has failed to develop this argument, we could conclude it is waived on appeal. **See In re R.D.**, 44 A.3d 657, 674 (Pa. Super. 2012) ("[I]t is an appellant's duty to present arguments that are sufficiently developed for our review[, and] when defects in a brief impede our ability to conduct meaningful appellate review, we may . . . find certain issues to be waived.") (citations omitted).

Nevertheless, in its opinion, the trial court thoroughly addressed each specific instance of Appellant's purported odd work behavior, and explained

why testimony concerning that behavior was relevant and admissible.  *See Trial Ct. Op.* at 32-35 (testimony that Appellant wore long johns, groomed himself, and sung that he loved "M." was relevant to explain why Williams reported the February 3rd incident, and corroborated Appellant's statement that he exposed himself to M.H.; testimony that Appellant generally stayed at work after his shift, but left immediately on February 3rd and then sat in his parked car for an hour was relevant to show he acted differently after the February 3rd incident, and showed consciousness of guilt; testimony that Appellant lingered in the basement for long periods of time was relevant because it was not necessary as part of his job duties, and corroborated his statement that he masturbated in the basement; testimony that one co-worker witnessed Appellant laying on a bed in the basement with his pants unbuckled was relevant to corroborate his statement that he masturbated in the basement).  Furthermore, the trial court determined that the probative value of this testimony — which triggered Williams' decision to report the February 3rd incident, detailed Appellant's change in behavior following incident, and corroborated his statement — was not outweighed by the danger of undue prejudice.  *See id.*   Detecting no abuse of discretion in the trial court's ruling, we rest upon its well-reasoned bases.  Further, we remind Appellant that "all relevant Commonwealth evidence is meant to prejudice a defendant [and] a trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration[.]" *See Danzey*, 210 A.3d at 342 (citation omitted).

In his fourth issue, Appellant insists the trial court erred when it denied his motion for a mistrial after the investigating police officer "expressly stated that he did not believe [Appellant's] multiple denials that he sexually assaulted M.H." Appellant's Brief at 41.

When reviewing a trial court's denial of a motion for mistrial, we must bear in mind the following:

> "It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion." . . . "A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." It is also settled that a mistrial is not necessary where cautionary instructions are adequate to overcome any potential prejudice. The law presumes that a jury will follow the trial court's instructions.

***Commonwealth v. Gilliam***, 249 A.3d 257, 274–75 (Pa. Super. 2021) (citations omitted).

Appellant's present complaint is based upon the testimony of Kingston Municipal Police Department Detective Thomas Paratore. Detective Paratore and his partner, Detective Steve Gibson, interviewed Appellant on February 5, 2016. N.T., Jury Trial, at 832, 835. Detective Paratore testified that Appellant was "friendly, cooperative, [and] a little nervous." ***Id.*** at 844. When the detective asked him about the possible sexual assault of M.H., Appellant "denied having done anything wrong or inappropriate" with her. ***Id.*** at 847. Detective Paratore testified that he then "specifically asked [Appellant] about [the February 3rd] incident . . . if [Appellant] ever touched her inappropriately

or if he ever had sex with her, and [Appellant] denied it numerous times." ***Id.***

at 848. Subsequently, the following exchange took place:

> [Commonwealth:] So, you said that [Appellant] initially denied having sexual contact with [M.H.]; is that correct?
>
> [Detective Paratore:] Yes.
>
> [Commonwealth:] Could you tell the jury about what happened after that?
>
> [Detective Paratore:] Well, I mean, to be perfectly honest with you, we didn't believe him.

***Id.*** At that point, Appellant's counsel objected, and the trial court overruled

the objection, noting that the testimony "goes to course of conduct." ***Id.*** at

848-49. Appellant's counsel moved for a mistrial, which the trial court denied.

***Id.*** at 849. However, the court then **sustained** the objection, and instructed

the jury "to disregard the witness's testimony as far as what he believed or

didn't believe." ***Id.***

Appellant contends the trial court erred when it denied his motion for a

mistrial. Relying on ***Commonwealth v. McClure***, 144 A.3d 970 (Pa. Super.

2016), Appellant insists that it is prejudicial error to allow a police officer to

express his opinion regarding the credibility of the defendant. Appellant's

Brief at 44. He further maintains the trial court's "*sua sponte* instruction to

the jury to 'disregard the witness's testimony . . .' was insufficient to cure any

possible prejudice." ***Id.***

The trial court explained that it denied Appellant's motion for a mistrial

because Detective Paratore's "single reference" to the fact that he did not

- 36 -

believe Appellant was unresponsive to the Commonwealth's question, and cured by the court's immediate instruction to the jury to disregard the testimony. *See* Trial Ct. Op. at 54. The court also determined that *McClure* did not compel a different result. *See id.* at 52-53. We agree.

In *McClure*, the defendant was the owner of a daycare business and was arrested after a child suffered a head injury while they were in her care. *McClure*, 144 A.3d at 973. Expert testimony was presented that the child's injury was consistent with a child who was shaken. *Id.* The defendant was convicted of aggravated assault and related charges. *Id.* On appeal to this Court, the defendant raised several challenges to the admission of evidence. *Id.* at 975. In her first claim, she argued the trial court abused its discretion when it admitted evidence related to her divorce, which occurred two years after the incident in question. *Id.* A panel of this Court concluded that the evidence was irrelevant and improperly admitted, and the trial court's admission of the evidence was not harmless , such that Appellant was entitled to a new trial. *Id.* at 975-76. Although Appellant was entitled to relief on her first claim, the panel, nevertheless, addressed the remaining evidentiary issues "as they may rise again on remand." *Id.* One of those remaining evidentiary claims was her assertion that the trial court abused its discretion when it permitted the investigating detective "to express his opinions that neither he nor the [Children and Youth Services] employee believed" Appellant's description of the incident, *i.e.*, that she tripped while carrying the child and child hit their head on a car seat. *See id.* at 973, 977.

The *McClure* panel explained that "[t]he determination of the credibility of a witness is within the exclusive province of the jury[, and i]t is an encroachment upon the province of the jury to permit admission of expert testimony on the issue of the credibility of a witness." *McClure*, 144 A.3d at 977 (citations omitted). Although the Commonwealth noted "the fact [the detective] charged [the defendant] with the crimes suggests that he did not believe" her, the panel opined that the detective's testimony was "not only irrelevant but also prejudicial[,]" and an error that "we cannot consider harmless." *Id.*

Appellant insists *McClure* stands for the proposition that when a police officer opines on the defendant's credibility — whether or not solicited by the Commonwealth — the encroach on the jury's credibility determination is so prejudicial "that no instruction can cure this fundamental error." Appellant's Brief at 45-46. We disagree, and conclude Appellant's application of *McClure* is too expansive. First, as noted by the trial court, the *McClure* decision does not detail the extent of the testimony offered by the detective or, whether it was solicited by the Commonwealth. Second, the decision does not indicate that, as here, the trial court **sustained** an objection to the testimony and provided an immediate cautionary instruction to the jury to disregard the testimony. Indeed, the *McClure* panel concluded only that the trial court's general charge, that credibility determinations are for the jury, did not render the error harmless. *See McClure*, 144 A.3d at 977. Thus, we agree with the trial court that *McClure* does not compel reversal under the facts presented

here: the trial court sustained an objection to a single reference by a detective (unsolicited by the Commonwealth) that he did not believe Appellant's denials of guilt, offered as an explanation as to why he continued to question Appellant, and immediately instructed the jury to disregard the detective's statement. Thus, no relief is warranted.[18]

Next, Appellant contends the trial court erred in refusing to instruct the jury concerning M.H.'s testimonial incompetency. Appellant's Brief at 51. He asserts the court's refusal to provide the jury with his requested instruction was "highly prejudicial" because the jury "could unreasonably conclude . . . that M.H. had the cognitive ability to accurately perceive, remember and communicate events truthfully through primitive sounds and non-verbal conduct[, that she was] communicating . . . that [Appellant] sexually assaulted her." *Id.* at 52-53.

When considering a trial court's failure to give a requested jury instruction, "[t]he relevant inquiry for this Court . . . is whether such charge was warranted by the evidence in the case." *Commonwealth v. Baker*, 963 A.2d 495, 506 (Pa. Super. 2008) (citations omitted). Moreover, "our scope of review is to determine whether the trial court committed a clear abuse of

---

[18] Appellant's focus on the fact that the trial court initially overruled his objection is a red herring. *See* Appellant's Brief at 42. As soon as Appellant's counsel requested a mistrial, the court then sustained the objection and instructed the jury to disregard the testimony. *See* N.T., Jury Trial, at 848-49.

discretion or an error of law which controlled the outcome of the case." **Id.**
at 507 (citation omitted).

> If we find that the court should have included the instruction, then
> we must determine whether its omission prejudiced the
> defendant. If we determine the decision not to give an instruction
> was an error of law which might have prejudiced the defendant,
> then we must determine the error was not harmless before
> granting a new trial.

**Commonwealth v. Mays**, 675 A.2d 724, 729 (Pa. Super. 1996). Likewise,

"[i]f the instruction proffered is inapplicable and improper, the court should

not charge on it." **Commonwealth v. Boyle**, 733 A.2d 633, 639 (Pa. Super.

1999).

On February 13, 2019, Appellant submitted proposed points for charge

to the trial court. Relevant herein, Appellant requested the court provide the

following instruction concerning M.H.'s testimonial incompetency:

> You have heard evidence about [M.H.] who has not been called to
> testify as a witness in this case. You cannot draw any adverse
> inference against either [Appellant] or the Commonwealth
> because she has not testified. This court has determined that
> [M.H.] is not competent to testify as a witness due to her mental
> impairment. At the time of the alleged incident and now, [M.H.]
> was and is incapable of perceiving accurately; she cannot
> communicate so as to be understood both directly or through an
> interpreter; she had an impaired memory; and she does not
> sufficiently understand the duty to tell the truth.

Appellant's Proposed Points for Charge, 2/11/19, at 11. Appellant objected

when the trial court refused to provide this instruction. **See** N.T., Jury Trial,

at 1067.

The trial court explained its ruling as follows:

The Court declined to give this "no adverse inference" instruction, which is not a suggested standard instruction, because it merely sets forth the factors used by the Court to determine testimonial competency pursuant to [Pa.R.E.] 601. The factors set forth in the instruction were pertinent to the Court's determination of testimonial competency, but once the C[o]urt decided [M.H.] was not competent to testify, whether she is incapable to perceiving accurately, cannot communicate so as to be understood both directly or through an interpreter, has an impaired memory, or does not sufficiently understand the duty to tell the truth was of no import to the jury because she was not called as a witness to testify before them. Thus there was no legitimate reason to instruct the jury as [Appellant] requested. The jury's duties and responsibilities did not require that they be instructed on the factors used by the Court to reach the legal determination of whether [M.H.] was incompetent to testify, instructing them on the factors would serve no legitimate purpose, and giving an unnecessary instruction was likely to confuse them.

Trial Ct. Op. at 61.

We agree with the court's reasoning. M.H. did not testify at trial. There was no reason to instruct the jury on her testimonial competency or lack thereof. Indeed, the trial court recognized, and refuted, this potential argument at the competency hearing. *See* N.T., 8/21/18, at 13 ("I know there's other evidence or testimony about other witnesses . . . who might testify to observations they made of the alleged victim. That's a separate issue. In my view, that's **not** a competency issue[.]") (emphasis supplied). Appellant could have presented expert testimony refuting the testimony of M.H.'s mother and caregivers that she was capable of expressing her likes and dislikes through primitive sounds and non-verbal behavior; however, he failed to do so. What he cannot do is piggyback this claim on the trial court's ruling concerning M.H.'s **testimonial** incompetence. Thus, no relief is warranted.

In his last claim, Appellant argues the trial court erred by admitting his statements into evidence when the Commonwealth failed to prove beyond a reasonable doubt the *corpus delicti* of his crimes. Appellant's Brief at 53. He insists the facts presented by the Commonwealth — absent his statement to Ms. Williams after the incident and his confession to police — was insufficient to establish that he engaged in indecent conduct with M.H. *See id.* at 56. He emphasizes that Ms. Williams acknowledged she did not observe any sexual contact during the February 3rd incident. *Id.* at 57-58. Further, Appellant provides alternative explanations for the other circumstantial evidence presented by the Commonwealth. *See id.* at 60-64.

The *corpus delicti* rule concerns the admissibility of evidence — specifically, a defendant's inculpatory statement — which we review for an abuse of discretion. *Commonwealth v. Murray*, 174 A.3d 1147, 1154 (Pa. Super. 2017). "The purpose of the rule is to prevent a conviction based solely upon a confession where no crime has in fact been committed." *Commonwealth v. Fears*, 836 A.2d 52, 67 (Pa. 2003). Thus:

> The *corpus delicti* rule requires the Commonwealth to present evidence that: (1) a loss has occurred; and (2) the loss occurred as a result of a criminal agency. Only then can "the Commonwealth . . . rely upon statements and declarations of the accused" to prove that the accused was, in fact, the criminal agent responsible for the loss.

*Commonwealth v. Taylor*, 831 A.2d 587, 590 (Pa. 2003) (citation omitted). In application, the rule requires a trial court to consider the admissibility of a defendant's statement in two phases:

(1) "In the first phase, the court determines whether the Commonwealth has proven the *corpus delicti* of the crimes charged by a preponderance of the evidence. If so, the confession [or extrajudicial statement] of the defendant is admissible[;]" (2) "In the second phase, the rule requires that the Commonwealth prove the *corpus delicti* to the factfinder's satisfaction beyond a reasonable doubt before the factfinder is permitted to consider the confession [or extrajudicial statement] in assessing the defendant's innocence or guilt."

***Commonwealth v. Bullock***, 170 A.3d 1109, 1118 (Pa. Super. 2017) (citation omitted). Furthermore, it is well-settled that:

[W]here a defendant's confession relates to two separate crimes with which he is charged, and where independent evidence establishes the *corpus delicti* of only one of those crimes, the confession may be admissible as evidence of the commission of the other crime. This will be the case only where the relationship between the two crimes is sufficiently close to ensure that the policies underlying the *corpus delicti* rule are not violated.

***Commonwealth v. McMullen***, 681 A.2d 717, 723 (Pa. 1996).[19]

Here, the trial court found "the record supports a determination that the jury, sitting as fact finder, properly concluded that the evidence presented, independent of [Appellant's] inculpatory statements, proved the *corpus delicti* of the crimes charges in Counts 5, 6 and 7 beyond a reasonable doubt." Trial Ct. Op. at 57-58. Those crimes include: institutional sexual assault (count 5), indecent assault of complainant with mental disability (count 6), and indecent assault without consent (count 7). The court succinctly opined:

---

[19] Although Appellant challenged both phases of the *corpus delicti* rule in his Rule 1925(b) statement, he references only the second phase in his argument. ***See*** Appellant's Concise Statement of Matters Complained of on Appeal Pursuant to Pa.R.App.P. 1925 at 6.

> [The] evidence established that in the early morning hours of February 3, 2016, LaShanda Williams entered [M.H.'s] room during the actual commission of and/or attempted commission of a crime and was a witness to same.

*Id.* at 57. The trial court further found: "Because the *corpus delicti* rule was satisfied as to the crimes charged in Counts 5, 6 and 7, application of the closely related crimes exception . . . allowed the jury to consider [Appellant's] inculpatory statements for purposes of determining his guilt with regard to the crimes charged in Counts 1, 2, 3, 4 and 8." *Id.* at 58.

Upon our review of the record, we agree. As noted *supra*, counts 5, 6, and 7 charged Appellant with the crimes of institutional sexual assault and indecent assault (complainant with mental disability/contact without consent). Each of these crimes requires proof that Appellant had indecent contact with M.H. *See* 18 Pa.C.S. §§ 3124.2(a) ("a person who is an employee [of a] mental health or mental retardation facility or institution commits a felony of the third degree when that person engages in . . . **indecent contact** with [a] resident") (emphasis added); 3126(a)(1), (6) ("[a] person is guilty of indecent assault if the person has **indecent contact** with the complainant, . . . for the purpose of arousing sexual desire in the person or the complainant and (1) the person does so without the complainant's consent; [or] (6) the complainant suffers from a mental disability which renders the complainant incapable of consent") (emphasis added). The Crimes Code defines "[i]ndecent contact" as "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S. § 3101.

- 44 -

Appellant emphasizes Ms. Williams did not observe him engaging in "an indecent contact when she went into M.H.'s room on the morning of February 3rd[.]" Appellant's Brief at 59. However, as the Commonwealth points out:

[Appellant] was clearly caught in a compromising position with M.H. [— a] position that is more like a position for attempted or completed sexual abuse than the normal way to change M.H.'s diapers.

Commonwealth's Brief at 43-44. Ms. Williams described the scene as follows. After hearing M.H. emit a "[s]cary . . . loud" scream, Ms. Williams left the other resident she was changing, and ran into M.H.'s room. N.T., Jury Trial, at 408-09. There, she encountered M.H. lying perpendicular across her bed, with her head hanging off the side of the bed and her legs in the air, over Appellant's arms. *Id.* at 409-11, 415. Additionally, M.H.'s pants were removed. *Id.* at 412. Ms. Williams testified she had "never seen [M.H.] changed like that." *Id.* Moreover, as soon as Ms. Williams entered the room, M.H. "was clawing" at her, "trying to get to [her]." *Id.* at 413. She described M.H. as "visibly upset." *Id.* at 417.

Furthermore, the Commonwealth presented evidence that M.H.'s other caregivers did **not** remove her pants to change her diaper, and always changed M.H.'s diaper with her head positioned "at the top of the headboard and her feet . . . at the bottom of the bed." N.T., Jury Trial, at 66, 183-84, 348-49. The other caregivers also testified that Appellant frequently changed M.H.'s diaper unnecessarily when it was dry (including on February 3rd), and would take "way too long" to do so. *Id.* at 70, 181-82, 384, 413.

- 45 -

Furthermore, with regard to the February 3rd incident, the Commonwealth presented evidence that Appellant groomed himself before his shift that evening, while singing "I love you, [M.];" and, following the incident, Appellant did not return to M.H.'s room, uncharacteristically left immediately after his shift, and sat in his car in the parking lot for an hour. *See id.* at 215-17, 221-22, 404-05, 421. Moreover, the next day, M.H.'s caregivers noticed a thumbprint-sized bruise on her inner thigh. *Id.* at 222-23, 442-44. Thus, we detect no abuse of discretion on the part of the trial court in admitting Appellant's inculpatory statements into evidence. Here, the circumstantial evidence presented was sufficient to support the jury's determination that M.H. was the victim of an indecent assault.[20] Thus, no relief is warranted.

Because we conclude Appellant has not raised any meritorious issues on appeal, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/20/2021

---

[20] We note too, the trial court properly charged the jury that it was permitted to consider Appellant's statements only if it first determined "beyond a reasonable doubt that a crime was committed." *See* N.T., Jury Trial, at 1040.