J-S33009-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| BRIAN KEITH RUSH | : | |
| | : | |
| Appellant | : | No. 215 EDA 2022 |

Appeal from the Judgment of Sentence Entered October 20, 2021,
in the Court of Common Pleas of Bucks County,
Criminal Division at No(s):  CP-09-CR-0000209-2020.

BEFORE:  KUNSELMAN, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY KUNSELMAN, J.:                **FILED OCTOBER 24, 2022**

Brian Keith Rush appeals from the judgment of sentence of 27 to 60 months' imprisonment entered following his conviction for possession of controlled substance contraband by inmate, possession of a controlled substance, and use or possession of drug paraphernalia.[1]  We affirm.

The trial court described the factual history:

In October of 2019, [Rush] was an inmate at Bucks County Correctional Facility and was being housed in the Men's Community Corrections Center while participating in the work release program.  [Rush] resided by himself in cell C-2 of the C module at the Community Corrections Center.  On October 28, 2019, at approximately 6:00 p.m., Corrections Officers Marco Semilia and Jacen Buono conducted a tour of the C module.  While conducting the tour, Officer Semilia looked into the window of cell

---

[1] 18 Pa.C.S.A. § 5123(a.2); 35 P.S. § 780-113(a)(16); and 35 P.S. § 780-113(a)(32).  Rush was charged with possessing both K2 (synthetic marijuana) and Suboxone (Buprenorphine and Naloxone).  The jury found Rush guilty of the first two crimes with respect to K2 and not guilty with respect to Suboxone.

C-2 and saw [Rush], along with another inmate, Cody Bruce, in the cell together. Cody Bruce did not reside in cell C-2 with [Rush]. Officer Semilia observed [Rush] holding what appeared to be a green leafy substance contained in a plastic wrap type of material. Officer Semilia suspected that the substance was contraband, so he attempted to open the cell door. He found the door to be locked. Officer Semilia directed [Rush] to drop the suspected contraband and unlock the door, but [Rush] refused to obey his commands. Instead, [Rush] put the plastic wrap material containing a green leafy substance down the front of his pants.

Officer Semilia used his own key to unlock the cell door and proceeded to order [Rush] to lie on the floor and Cody Bruce to put his hands on the wall. Officer Semilia handcuffed [Rush] and then called for backup on his radio. Officer Buono overheard the call for help and ran across the C module to cell C-2 to assist Officer Semilia. Lieutenant [Nick] Minasian and Officers [Arthur] Malindi and [Patrick] Rooney also arrived at cell C-2 following Officer Semilia's call for help.

Officer Buono removed [Rush] from cell C-2 and began to escort him to a holding cell while Officer Malindi took custody of Cody Bruce. Officer Semilia locked cell C-2 in order to prevent anyone from tampering with possible contraband or other evidence. As the officers were walking [Rush] to the holding cell, Officer Semilia noticed a green leafy substance on the floor.

When [Rush] reached the holding cell, Officer Buono performed a quick pat-down search. While performing the pat-down search, Officer Buono and Lieutenant Minasian noticed more of a leafy green substance falling out of [Rush's] pant legs and onto the floor. Officer Semilia and Lieutenant Minasian collected the green leafy substance that fell onto the floor into a brown paper bag. Officer Buono then discovered a plastic wrapped baggie containing a green leafy substance in [Rush's] left pant pocket. The baggie found by Officer Buono as well as the brown paper bag used to collect the green leafy substance which had fallen on the floor was turned over to Lieutenant Minasian. Lieutenant Minasian placed the plastic wrapped package into the brown paper bag and later photographed the contraband, placed it in an evidence bag and stored it in a safe in a secure room [to] which only lieutenants have access.

[Rush] was then taken to the unclothed body search room where he removed his clothing. Officer Buono inspected [Rush's]

pants and found a white latex glove containing a green leafy substance. Once again the green leafy substance was handed over to Lieutenant Minasian who placed it in the brown bag. Lieutenant Minasian later photographed the substance, placed it in an evidence bag and stored it in the evidence safe.

Officers Rooney and Semilia went back to search cell C-2. When they unlocked the door, Officers Rooney and Semilia found more of a green leafy substance on [Rush's] bed. In addition, the officers found a pair of jeans in a plastic bag in front of [Rush's] locker. Inside the jeans pocket was a blue glove which contained an unopened Suboxone strip. The Suboxone strip was also turned over to Lieutenant Minasian who placed it in the brown paper bag with the other evidence collected. Lieutenant Minasian later took photographs of the strip, placed it in an evidence bag and secured it in the evidence safe.

Trial Court Opinion, 3/14/22, at 1–3 (record citations omitted). Officers also secured Rush's black sock, which had the same green substance that had fallen from Rush's pant leg on it.

The next morning, October 29, 2019, Investigator Daniel Onisick retrieved the evidence, took additional photographs, and sealed it in clear plastic evidence bags. Investigator Onisick sent the two balls of suspected K2, the loose substance from the floor, and the Suboxone strip to NMS Labs for testing. Laboratory chemical analysis later confirmed that the substances were K2 and Suboxone.

On October 31, 2019, three days after the incident, Investigator Onisick attempted to interview Rush. He took Rush to the investigations unit office and advised Rush that he was likely to face criminal charges for possessing contraband. Investigator Onisick repeatedly attempted to advise Rush of his **Miranda** rights; however, Rush angrily interrupted. Rush said that he found

the items in the bathroom and was showing them to Cody Bruce and that the jeans on the floor were not his because he hangs his jeans up. As Investigator Onisick kept trying to tell Rush his **Miranda** rights, Rush complained that the items were not yet tested, and he asked what Cody Bruce had told Investigator Onisick. Investigator Onisick ended the attempted interview because he knew that Rush did not want to be **Mirandized**. This interaction lasted "a couple of minutes" and was not recorded.

On December 9, 2019, Rush was charged in connection with the incident. On July 1, 2021, following the appointment of conflicts counsel, Rush filed a motion (1) to exclude evidence of the drugs based on a defective chain of custody, (2) to dismiss the case because the Commonwealth did not provide exculpatory evidence pursuant to **Brady v. Maryland**, 373 U.S. 83 (1963), (3) to suppress evidence of Rush's statements based on a violation of **Miranda v. Arizona**, 384 U.S. 436 (1966), and (4) to compel discovery. The trial court heard and denied Rush's motions before trial on August 4, 2021.

The case proceeded to trial on August 4 through 6, 2021, and the jury found Rush guilty of the above offenses. On October 20, 2021, the trial court sentenced Rush to serve 27 to 60 months of imprisonment for the contraband offense, with no additional penalty on the other offenses. Rush moved to reconsider, the trial court denied the motion, and Rush appealed. Rush and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Rush now raises five issues for our review:

A. Did the trial court err when it denied [Rush's] suppression motion and permitted [Rush's] statements to be admitted at trial when those statements were made during an in-custody interrogation and where [Rush] did not receive **Miranda** warnings?

B. Did the trial court err when it denied [Rush's] motion to dismiss the case as the prosecution failed to produce and preserve several pieces of evidence in violation of **Brady v. Maryland**?

C. Did the trial court err when it denied [Rush's] motion to compel discovery, which should have been produced pursuant to Rule 573?

D. Did the trial court err when it failed to declare a mistrial when the discoverable material was produced mid-trial?

E. Did the trial court err in denying [Rush's] suppression motion relating to controlled substances when the evidence did not meet the requirements of Pennsylvania Rule of Evidence 901?

Rush's Brief at 5.

## A. Suppression of Statements

Rush first argues that the suppression court should have suppressed his statements to Investigator Onisick based on a violation of **Miranda v. Arizona**, 384 U.S. 436 (1966). Rush's Brief at 28–33. There being no dispute that Rush was in custody, the issue is whether Investigator Onisick subjected him to an interrogation.

We review Rush's claim according to these well-settled principles:

our standard of review for the denial of a suppression motion is *de novo* and is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Our scope of review is to consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole.

*Commonwealth v. Green*, 265 A.3d 541, 550–51 (Pa. 2021) (citations and quotation marks omitted).

The suppression court found that although Investigator Onisick attempted to interrogate Rush, he "did not actually begin interrogation" because Rush "did not allow himself to be given *Miranda* rights." N.T., Hearing, 8/4/21, at 43. Specifically, the court found based on Investigator Onisick's testimony from the pretrial hearing that:

> on October 31, 2019, [Investigator Onisick] interviewed [Rush] and informed him that he was possibly facing criminal charges for possession of synthetic marijuana and Suboxone. Investigator Onisick also told [Rush] that he wished to advise him of his *Miranda* rights. At the time, [Rush] was very animated and angry. [Rush], not allowing Investigator [Onisick] to *Mirandize* him, spontaneously blurted out that he had found the items in the bathroom and that he was showing them to Cody Bruce when the officers came into his cell. Investigator [Onisick] continued to try to *Mirandize* [Rush], but [Rush] continued to talk over him. [Investigator Onisick] ended the interview because he did not believe [Rush] wished to be advised of his *Miranda* rights.

Trial Court Opinion, 3/14/22, at 10. The court found that Rush's statements were spontaneous, not in response to any questioning. *Id.* at 10–11. Therefore, the court denied suppression.[2]

On review, we find no error. *Miranda* prevents the government from using "statements stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel." *Commonwealth v. Gaul*, 912 A.2d

---

[2] Rush's statements were admitted through Investigator Onisick's testimony at trial. N.T., 8/5/21, at 165–169.

252, 255 (Pa. 2006) (citing **Commonwealth v. DeJesus**, 787 A.2d 394 (Pa. 2001), *abrogated on other grounds*, **Commonwealth v. Freeman**, 827 A.2d 385 (Pa. 2003)).  This applies when "a person in custody is subjected to express questioning or its functional equivalent." **Id.** (quoting **Rhode Island v. Innis**, 446 U.S. 291, 300–01 (1980)).  "That is to say, the term 'interrogation' under **Miranda** refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." **Innis**, 446 U.S. at 301.

Whether police conduct is the functional equivalent of interrogation depends on the totality of the circumstances.  **Gaul**, 912 A.2d at 255 (citing **Commonwealth v. Williams**, 640 A.2d 1251, 1259 (Pa. 1994)).

> In conducting the inquiry, we must also keep in mind that not every statement made by an individual during a police encounter amounts to an interrogation.  Volunteered or spontaneous utterances by an individual are admissible even without **Miranda** warnings. **See, e.g.**, **Commonwealth v. Baez**, 554 Pa. 66, 720 A.2d 711, 720 (1998).  Similarly, **Innis** does not "place the police under a blanket prohibition from informing a suspect about the nature of the crime under investigation or about the evidence relating to the charges against him." **DeJesus**, 787 A.2d at 402.

**Id.**  "**Miranda** does not preclude the admission of spontaneous utterances" by a suspect in custody.  **Commonwealth v. Johnson**, 42 A.3d 1017, 1029 (Pa. 2012) (citing **Baez**, **supra**).

*Gaul* illustrates when police statements are the functional equivalent of an interrogation. There, an investigator read a suspect the criminal complaint and affidavit of probable cause concerning his arrest for theft, relayed incriminating statements from the victim, twice explained that the suspect would have to be informed of his *Miranda* rights, and asked if he wanted to discuss the pending charges. *Gaul*, 912 A.2d at 254. Our Supreme Court held that the investigator should have known that presenting the victim's incriminating statement in addition to the charges would be reasonably likely to elicit an incriminating response. *Id.* at 256 (following *DeJesus*, *supra*).

Here, unlike in *Gaul*, the *only* aspect of the interaction claimed to be the functional equivalent of questioning is Investigator Onisick's initial statement that Rush was likely facing criminal charges for contraband. During the brief interaction, Investigator Onisick did not ask if Rush wanted to discuss the charges or present any evidence. Instead, when Rush asked what Cody Bruce said, Investigator Onisick ended the interaction. In attempting to interview Rush, Investigator Onisick was permitted to tell him about the nature of the crime under investigation. *Id.* at 255. We do not hold that this statement alone was reasonably likely to elicit an incriminating response; rather, it is the kind of statement "normally attendant to arrest" that is not equivalent to an interrogation under *Innis*. Absent the additional circumstances in *Gaul*, we conclude that the trial court did not err in determining that Rush was not yet subject to interrogation when he interjected. Therefore, we deny relief on Rush's first issue.

**B. Preservation and Production of Evidence**

Rush next challenges the trial court's denial of his motion to dismiss based on the Commonwealth's failure to provide material exculpatory evidence in discovery. He complains that the Commonwealth did not give him Cody Bruce's discipline records, records of why Cody Bruce did not report to work release on October 28, 2019, and video surveillance showing Cody Bruce entering cell C-2. Rush's Brief at 36. He further challenges the failure to provide documents that contradicted officers' testimony until the second day of trial, after they had testified. *Id.* at 38. Finally, he notes that investigators did not preserve the jeans recovered from the floor of cell C-2, which had Suboxone in the pocket.[3]

Initially, we note that this is a broader challenge than the trial court had the opportunity to consider before trial. Rush's omnibus motion faulted the Commonwealth for not preserving the jeans or the video of Cody Bruce entering the cell. Motion, 7/1/21, at 5–6 (unnumbered). Only these two items were addressed at the pretrial hearing. N.T., Pretrial Hearing, 8/4/21, at 30–38. Therefore, we limit our review to the trial court's denial of Rush's motion to dismiss based on the jeans and the video as alleged ***Brady*** violations.

---

[3] This roughly corresponds to the third issue in Rush's concise statement of matters complained of on appeal: "The Trial Court erred in denying Appellant's Motion to Dismiss for the Commonwealth's . . . failure to produce evidence that was exculpatory to Appellant, in violation of ***Brady v. Maryland***, 373 U.S. 93 (1963), and it[s] progeny."

In **Brady**, the United States Supreme Court held that the Fourteenth Amendment's Due Process Clause

> requires defendants be provided access to certain kinds of evidence prior to trial, so they may "be afforded a meaningful opportunity to present a complete defense."  This guarantee of access to evidence requires the prosecution to turn over, if requested, any evidence which is exculpatory and material to guilt or punishment, **see Brady**, and to turn over exculpatory evidence which might raise a reasonable doubt about a defendant's guilt, even if the defense fails to request it, **see United States v. Agurs**, 427 U.S. 97 (1976).  If a defendant asserts a **Brady** or **Agurs** violation, he is not required to show bad faith.
>
> There is another category of constitutionally guaranteed access to evidence, which involves evidence that is not materially exculpatory, but is potentially useful, that is destroyed by the state before the defense has an opportunity to examine it.  When the state fails to preserve evidence that is "potentially useful," there is no federal due process violation "unless a criminal defendant can show bad faith on the part of the police."  [**Arizona v. Youngblood**, 488 U.S. 51, 58 (1988).]  Potentially useful evidence is that of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  [**Id.** at 57.]  In evaluating a claim that the Commonwealth's failure to preserve evidence violated a criminal defendant's federal due process rights, a court must first determine whether the missing evidence is materially exculpatory or potentially useful.

**Commonwealth v. Ward**, 188 A.3d 1301, 1308–09 (Pa. Super. 2018) (quoting **Commonwealth v. Williams**, 154 A.3d 336, 339 (Pa. Super. 2017)) (citations modified).

Here, the trial court determined that the evidence the Commonwealth did not provide to Rush was "potentially useful" under **Youngblood**, rather than "materially exculpatory" under **Brady**.  Trial Court Opinion, 3/14/22, at 8–9; N.T., Pretrial Hearing, 8/4/21, at 43–44.  Because Rush did not

demonstrate that this missing evidence was intentionally destroyed or that the officers acted in bad faith, the trial court denied Rush's motion to dismiss.

We discern no error. First, as to the video, even if a video of Cody Bruce bringing jeans into cell C-2 was shown to the jury, this would not have contradicted the officers' testimony that Rush was holding a substance later identified as K2 and put it in his pants. Second, as to the jeans from the cell floor, the jury acquitted Rush of possessing the Suboxone that was in the jeans. The jeans were not potentially for the charges for which the jury found Rush guilty. Therefore, no relief is due on this issue.

### C. Motion to Compel Discovery

In his third issue, Rush argues that the trial court's denial of his motion to compel discovery prevented him from presenting a defense. Rush's Brief at 39–41.

A trial court has discretion to resolve pretrial discovery issues; we will affirm unless the trial court has abused its discretion. *Commonwealth v. Holt*, 273 A.3d 514, 548 (Pa. 2022) (citing *Commonwealth v. Rucci*, 670 A.2d 1129, 1140 (Pa. 1996)), *petition for cert. filed*, No. 22-5463 (U.S. Aug. 24, 2022).

Pennsylvania Rule of Criminal Procedure 573 provides in relevant part that on the defendant's request, the Commonwealth must disclose "all of the following requested items or information, provided they are material to the instant case. . . . Any evidence favorable to the accused that is material either

to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth." Pa.R.Crim.P. 573(B)(1)(a).

In his omnibus pretrial motion, Rush moved to order the Commonwealth to produce:

    a. Video Recordings of Cody Bruce entering into [cell C-2];

    b. All audio or video recordings of statements made by Cody Bruce, Brian Rush, and any other person interviewed relating to this incident;

    c. Inmate file for Cody Bruce, including but not limited to reports relating to suspected drug offenses;

    d. Prior record of Cody Bruce; [and]

    e. The entire NMS file relating to the analysis of the alleged controlled substances outlined in the November 20, 2019 Drug Chemistry Final Report[.]

Motion, 7/1/21, at 7 (unnumbered). The first four items requested relate to Rush's theory that Cody Bruce used drugs, did not go to work because of drug issues, and was the person who brought the jeans with drugs into cell C-2.

The trial court explained that it did not grant Rush's motion[4]:

because the Commonwealth alleged that it turned over all of the relevant evidence in its possession and that many of the items referenced by [Rush] were determined not to exist. [T]he Commonwealth maintained that it was not in possession of any surveillance videos capturing Cody Bruce entering [Rush's] cell. During trial, the Commonwealth stated that in regard to the other incident in which Cody Bruce was in the cell of another inmate who was charged with possession of a controlled substance, officers did not find any contraband on Cody Bruce. There was no evidence to suggest that the Commonwealth withheld any incident

---

[4] It is not clear from the record when—or if—the trial court formally denied Rush's pretrial discovery motion.

reports pertaining to Cody Bruce which were relevant to this case. Moreover, evidence at trial revealed that a report did not exist indicating that Cody Bruce failed to attend work release on the date of the incident because he was suspected of drug involvement. While the Bucks County Correctional Facility maintains a log indicating when inmates leave and return from work, uncontradicted testimony at trial established that the log does not record the reasons why an inmate did not attend work on any particular day. Because evidence at trial revealed that the log on the day of the incident did not mention Cody Bruce nor the reasons why he did not go to work, the log was clearly of no relevance to the present case and thus the Commonwealth was not required to produce it.

Trial Court Opinion, 3/14/22, at 11–12.

We discern no abuse of discretion. By the time Rush's counsel entered the case and requested discovery, the videos from before the incident had been automatically overwritten and were not within the Commonwealth's possession. Investigator Onisick testified that due to privacy concerns, none of the interviews were recorded. Rush does not suggest how records related to Cody Bruce were material to the Commonwealth's case against Rush, which included evidence that Rush was holding K2 in his hands and in his pants. And Rush has failed to argue why he needed the entire NMS Labs file, let alone why the trial court abused its discretion by denying an order to provide it. Therefore, Rush is not entitled to relief on this issue.

### D. Mistrial

In his fourth issue, Rush challenges the trial court's denial of a mistrial based on evidence discovered mid-trial that contradicted officers' testimony that they did not search Cody Bruce's cell.

> "It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion." . . . "A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." It is also settled that a mistrial is not necessary where cautionary instructions are adequate to overcome any potential prejudice. The law presumes that a jury will follow the trial court's instructions.

*Commonwealth v. Dula*, 262 A.3d 609, 633 (Pa. Super. 2021) (quoting

*Commonwealth v. Gilliam*, 249 A.3d 257, 274–75 (Pa. Super. 2021)); *see*

Pa.R.Crim.P. 605 (allowing a defendant to move for mistrial when an event

prejudicial to the defendant occurs during trial). A mistrial is not required

where previously unknown evidence revealed at trial that is not a discovery

violation, such as where the Commonwealth did not have possession or

knowledge of non-exculpatory evidence that is then discovered during trial.

*Commonwealth v. Sullivan*, 820 A.2d 795, 804 (Pa. Super. 2003).

By way of background, during the first day of trial, Officer Semilia

testified on cross-examination that he did not search Cody Bruce or his cell:

Q. Are you aware if anything at all was found on Cody Bruce?

A. I'm not aware.

Q. You didn't search him?

A. Nope.

Q. Did you search his cell afterwards?

A. Nope.

Q. Do you know if anyone searched his cell?

A. I do not recall.

N.T., Trial, 8/4/21, at 51.

Likewise, Officer Buono testified on direct examination that he did not search anyone other than Rush:

Q. Now, did you take part in any other searches that night?

A. No, ma'am.

Q. So the extent of your involvement was to search the defendant, is that correct?

A. Yes, ma'am.

N.T., Trial, 8/4/21, at 73.

However, the next morning, the Commonwealth provided to the Defense a handwritten log reflecting that Officers Buono, Rooney, and Semilia packed items from the cells of Rush, Cody Bruce, and another inmate on October 28, 2019, the night in question. After a brief recess, Rush moved for a mistrial based on the late receipt of the log that contradicted the testimony of Officers Semilia and Buono.

The trial court denied the motion for mistrial, reasoning that the log was not exculpatory and that the late receipt of the log did not prejudice Rush. Instead, the court allowed Rush to re-call the officers, and the court provided a "false in one, false in all" jury instruction that Rush requested.

During the testimony of Officer Rooney, Rush introduced the log into evidence. Officer Rooney agreed that the log showed that Officers Semilia and Buono searched Cody Bruce's cell with him. In his case in chief, Rush re-called Officers Buono and Semilia to ask about their involvement in searching

- 15 -

Cody Bruce's cell.  Both officers indicated that they would have documented if they had found contraband in that search.

We cannot conclude that the trial court abused its discretion in denying Rush's motion for a mistrial.  While Rush complains that he was unable to fully investigate, he does not explain how the court's ruling hindered his defense.  Nor does he describe how his late receipt of the log was prejudicial.  The log was potentially useful to impeach two Commonwealth witnesses, which the trial court allowed Rush to do.  Under these circumstances, we find no abuse of discretion and therefore deny relief on this issue.

### E. Chain of Custody

In his final issue, Rush argues that the trial court should have granted his motion to exclude the drugs from trial (and dismiss the charges) because the Commonwealth did not properly authenticate the drugs, as required by Pennsylvania Rule of Evidence 901.[5]  Rush's Brief at 45–48.  Rush maintains that the Commonwealth could not establish that the drugs introduced were

---

[5] Rule 901 provides in relevant part:

> (a) **In General.**  Unless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
>
> (b) **Examples.**  The following are examples only—not a complete list—of evidence that satisfies the requirement:
>
>> (1) *Testimony of a Witness with Knowledge.*  Testimony that an item is what it is claimed to be.

Pa.R.E. 901(a)–(b)(1).

the same as the substances taken from the cells where he was searched, based on irregular collection procedures and inconsistent testimony that did not match the chain of custody documents.

We review a trial court's evidentiary rulings, including whether evidence has been authenticated, for an abuse of discretion. *See Commonwealth v. Wright*, 255 A.3d 542, 550–51 (Pa. Super. 2021).

This Court has explained how admissibility of physical evidence requires a chain of custody to establish a reasonable inference that the evidence is what it is claimed to be:

> While the Commonwealth bears the burden of demonstrating some reasonable connection between the proferred exhibits and the true evidence, it need not establish the sanctity of its exhibits beyond a moral certainty. The Commonwealth need not produce every individual who came into contact with an item of evidence, nor must it eliminate every hypothetical possibility of tampering. A complete chain of custody is not required so long as the Commonwealth's evidence, direct and circumstantial, establishes a reasonable inference that the identity and condition of the exhibits have remained the same from the time they were first received until the time of trial. Any gaps in testimony regarding the chain of custody go to the weight to be given the testimony, not to its admissibility.

*Commonwealth v. Cugnini*, 452 A.2d 1064, 1065 (Pa. Super. 1982) (citations omitted).

For example, where a police officer who handled drug evidence was later convicted for stealing other evidence, we nevertheless affirmed the trial court's ruling that the drug evidence was admissible. *Commonwealth v. Soto*, 202 A.3d 80, 101–02 (Pa. Super. 2018). Once the Commonwealth

established a foundation that the drugs at trial were the same as those taken from the defendant, any issues with the chain of custody went to the weight, not the admissibility of that evidence. *Id.* at 102.

Here, the trial court permitted the parties to litigate the admissibility of the drug evidence prior to trial. At the pretrial hearing, Investigator Onisick testified about how the physical evidence was collected and documented. The court "found that his testimony sufficiently established a reliable chain of evidence" and therefore ruled that the evidence would be admissible. Trial Court Opinion, 3/14/22, at 6.

> Investigator Onisick testified that on October 29, 2019, he was accompanied by Lieutenant John Mannarino to the evidence safe located in the secure room at the Bucks County Correctional Facility. [Only lieutenants have access to this room.] Investigator Onisick watched Lieutenant Mannarino unlock the evidence safe and remove evidence envelopes which were handed to Investigator Onisick. When Investigator Onisick opened the evidence envelopes, he was able to confirm that [their] contents matched the photographs that Lieutenant Minasian took of the contraband.
>
> Investigator Onisick further testified that Officer Buono's chain of custody form differed from the crime lab drug identification requisition form because Investigator Onisick cut open the white glove in order to examine its contents. Investigator Onisick testified that as an investigator, it is common practice to open packaging material in order to determine the contents of what is inside. When Investigator Onisick sent the plastic wrapped contents to the lab, he did not include the white glove for testing. Thus, this explains why Officer Buono's chain of custody form differs from the crime lab drug identification requisition form. Further, Investigator Onisick took photographs of the evidence. One of the photographs depicts the recovered contraband in a plastic wrapped baggie next to a cut opened white glove. The lab report did not mention a white glove because only the contents of the white glove were sent for testing. Thus,

> [Rush's] argument that the contraband was not properly authenticated because the lab report does not perfectly mirror the photographs is without merit.
>
> Investigator Onisick stated that after taking photographs of the two baggies containing a green leafy substance, he placed them into a single Ziploc bag and then placed the Ziploc bag into an evidence bag. Investigator Onisick testified that he placed both baggies into a single Ziploc bag because both items were taken from [Rush's] person and appeared to be the same substance. When asked by [Rush's] counsel whether he knew which baggie was confiscated from the pat-down search and which was discovered from the unclothed body search, [Investigator] Onisick said that he could not be sure. However, [Rush's] argument that the evidence should be excluded because the two plastic wrapped baggies could not be differentiated is not persuasive. We determined that Investigator Onisick's testimony sufficiently established [a] chain of custody such that excluding evidence either pre-trial or at trial was not merited. We concluded that the issue pertaining to whether [Rush] was in possession of any of the items that were tested was for the jury to determine. Accordingly, we denied [Rush's] Motion to Exclude Evidence and his Motion to Dismiss.

Trial Court Opinion, 3/14/22, at 6–8 (record citations omitted, "Onisick" spelled as in the transcript).

We conclude that the trial court did not abuse its discretion. The officers' testimony before and during trial provided a reasonable inference that the substances tested were the same as those recovered from Rush. As the trial court noted, the jury was free to determine whether they were in fact the same substances based on the defects indicated. Because the trial court did not abuse its discretion, we deny relief on this issue.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/24/2022</u>