J-A05013-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KIAN DEATER | : | |
| | : | |
| Appellant | : | No. 680 EDA 2025 |

Appeal from the Judgment of Sentence Entered September 5, 2024
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0003623-2022

BEFORE: KUNSELMAN, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED MAY 11, 2026**

Kian Deater appeals from the judgment of sentence entered after he was convicted of two counts of aggravated assault, firearms not to be carried without a license, simple assault, recklessly endangering another person, and persons not to possess firearms.[1] He challenges the sufficiency and weight of the evidence for the aggravated assault convictions and the trial court's evidentiary rulings allowing a police officer to narrate a video. We affirm.

Police arrested and charged Deater after an incident on June 19, 2022. The case proceeded to a bifurcated jury trial beginning on July 8, 2024. The Commonwealth presented testimony from three law enforcement witnesses. The trial court later recounted the evidence from trial:

---

[1] 18 Pa.C.S. §§ 2702(a)(1), 2702(a)(4), 6106(a)(1), 2701(a)(3), 2705, and 6105(a)(1), respectively.

On June 19, 2022—Father's Day—Catasauqua Police responded to a call of shots fired at the Catasauqua playground. Prior to the shooting, much of the park was crowded due to the holiday. When officers arrived, they spoke to witnesses and then proceeded to search the park for the shooter. Thereafter, two individuals were seen running together near a creek in the park. One individual—later identified as a male juvenile, herein "J.R."—was wearing red shorts and a white tank top, and he was observed with a handgun in his waistband. The other individual—later identified as the defendant, Kian Deater—was wearing distinctive black and turquoise shorts with yellow trim. J.R. was the first to be taken into custody. Nearby, police recovered a firearm with an extended magazine, and an additional magazine. [The magazines contained live ammunition. Deater] was then taken into custody close by. [Deater] was wet and was wearing black socks but no shoes.

When police processed the scene, they recovered spent casings near the basketball court. The casings were later determined to have been fired from the handgun recovered near J.R. [Deater's] cell phone was also recovered from the area of the basketball courts. The phone was subsequently searched, and police found photos of [Deater with] a firearm that matched the one recovered. [The phone also contained messages Deater sent the day before the incident: "Yo lemme tote the 48 or the 17 so JayR can tote my 45 while he buy a knox unless u wanna pass down one of those that ain't ya place so I'm asking" and "It'll be jus while we together ima be with u all night"] Finally, a white Nike sneaker, which was wet, was recovered near where [Deater] was seen running.

Police obtained video surveillance footage from the park. In [one of the videos], several people can be seen playing basketball, including J.R.—wearing red shorts, a white tank top, and black sneakers. [Deater]—wearing the distinctive black and turquoise shorts with yellow trim, a black hoodie, black socks, and white sneakers—is seen pacing near the courts, in the area where the spent casings were recovered. Thereafter, a vehicle arrived with at least two occupants inside and parked nearby. [Seconds later, Deater moved consistently with] removing a handgun from the pocket of the black hoodie and firing multiple shots in the direction of the vehicle. When the shots were fired, the vehicle drove away and several people were seen running from the area. The occupants of the vehicle were never identified. [Deater] and J.R.

were seen running away in the same direction, towards the surveillance camera.

Trial Court Opinion, 5/28/25, at 2–4 (lightly edited).

The Commonwealth introduced the surveillance footage through Officer Joelle Mota. The videos contained no sound. Throughout the presentation, Officer Mota testified about what the video depicted. Deater objected several times. The first video depicted two people (argued to be Deater and J.R.) running. The trial court sustained certain objections but allowed Officer Mota to testify that one video showed the people running north, past a pool and towards a concert pavilion:

[By the prosecutor]:

Q.  Are [the date and time] accurate?

A.  Yes, June 19, 2022, 1841 hours. So that's our suspect running. (Witness indicated.) And that's with the description given, turquoise—

> [Defense counsel]: I'm going to object to the description given.
>
> [Prosecutor]: Without talking about what someone else told you—
>
> THE COURT: All right. Sustained.

[By the prosecutor]:

Q.  That's the person—

> THE COURT: Hold on a second. I'll strike that testimony. Go ahead.

[By the prosecutor]:

Q.  So, going back, that's the person that was of interest to you, correct?

A.  Correct.

Q.     And running?

A.     Yeah, running past—

Q.     Past the bathrooms?

A.     Yes.

Q.     And headed where here?

A.     He's heading—

[Defense counsel]: I'm going to object as to where he's heading.  I think the video speaks for itself.

THE COURT: Well, I mean, he can say in what direction.

[Prosecutor]: Towards what?

THE COURT: North, south, east, or west.

[Prosecutor]: Well, I'm not really interested in the direction.

THE COURT: All right.

[By the prosecutor]:

Q.     Towards what park facilities is that person now running? (Indicated.)

A.     He's—that person's running towards the concert pavilion. (Witness indicated.)

[Defense counsel]: And again, Your Honor, I would object.  I don't think he can say where he's running to.  We just described the pool—

THE COURT: That's fine.

[Defense counsel]: —a white building—

THE COURT: And he can say in what direction—

[Prosecutor]: He did just say in the direction—

THE COURT: All right.  Hold on, folks.

[Prosecutor]: —behind the trees is the concert pavilion.

THE COURT: Hold on, folks. He can say in what direction he's running. Is he running towards the pool? Is he running towards the—that's fine. Go ahead. I'll allow it.

[Officer Mota]: He's running north.

[By the prosecutor]:

Q.     Towards what pool—park facilities?

A.     Running north past the pool, heading towards—past the snack building, heading towards the big concert pavilion.

N.T., 7/9/24, at 66–69.

The second video depicted the basketball court and the alleged shooting. The trial court allowed Officer Mota to testify over Deater's objection where the black car shown in the video was driven and how many people were in the car.

Q.     And I zoomed in here. . . . Now, have you noticed something changed in the video?

A.     Yes.

Q.     At this time?

A.     Yes.

Q.     What's that?

A.     Some black vehicle coming in down Bridge Street. (Witness indicated.)

[Defense counsel]: Your Honor, I am going to object just on the basis of the narration of the video by the officer. My position is that the [jurors'] opinion of what they're seeing, if they see something change in the video or if they do not, is what is at issue, and that it should be for their observation, not the officer's.

THE COURT: Understood. [Prosecutor?]

- 5 -

[The prosecutor]: However, Your Honor, the officer is saying it's Bridge Street. He's describing the direction of travel of things. He's certainly permitted to do that.

THE COURT: I will permit some narration. Go ahead. So it's overruled.

[The prosecutor]: Thank you.

[By the prosecutor]:

Q. And what street is that black car coming in off of?

A. Down Bridge.

Q. Bridge Street?

A. West. It's parking behind the white sedan. (Witness indicated.)

[Defense counsel]: Same objection, Your Honor.

THE COURT: Overruled.

[Officer Mota]: Somebody tries to get out.

[Defense counsel]: Your Honor, I'm going to object. I would argue that the officer isn't even being asked a question. He's simply narrating the video.

THE COURT: All right. Sustained. That comment will be stricken. Go ahead.

[The prosecutor]: Thank you.

[By the prosecutor]:

Q. Officer Mota, do you know who is in the black car?

A. No.

Q. Do you know whether there are people in the black car?

A. Yes.

Q. Obviously, a driver, right? Fair to say?

A. Yes.

Q. I mean, I don't think we have the full approval for self-driving cars yet.

- 6 -

Q.    No.

Q.    And then, do you see another person in the vehicle as well?

A.    A passenger.  Front seat passenger.  (Witness indicated.)

Q.    And we can see things that happened in that park, correct?

A.    Yes.

Q.    And we see that car leave, correct?  (Indicated.)

A.    Yes.

*Id.* at 73–76.  Officer Mota continued to describe that the black car drove east and that the basketball courts emptied.  Without any objection from Deater, Officer Mota identified one person's shorts in the video as the same shorts that Deater was wearing.  *Id.* at 78.  He also testified which direction that person went, and he stated that the two videos showed the same people running.  When Officer Mota was describing the surveillance footage, he did not mention a gun or say that Deater shot at the people in the car.  He did, however, agree with the prosecutor that "we can see things that happened in that park." *Id.* at 76.

The jury found Deater guilty of two counts of aggravated assault, firearms not to be carried without a license, simple assault, and recklessly endangering another person.  Following additional testimony that Deater was previously convicted of aggravated assault, the jury found Deater guilty of persons not to possess firearms.

The trial court sentenced Deater to an aggregate term of 17½ to 35 years of confinement, followed by 12 months of probation.  Deater filed post-sentence motions, which the trial court denied.  Deater timely appealed.

Deater and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Deater presents three issues on appeal:

1. The evidence presented at trial was insufficient to support the verdict, specifically, the evidence could not support a finding of guilt beyond a reasonable doubt for the offenses of aggravated assault attempts to cause serious bodily injury [Count 1], and aggravated assault attempts to cause bodily injury [Count 2] based upon the allegations that the Appellant shot through a crowd targeting an occupied vehicle in that:

    (a)   Appellant was convicted based solely upon the testimony of police officers who were not present when the shots were fired;

    (b)   No evidence was presented at trial of physical evidence of damage to the vehicle that was allegedly fired upon;

    (c)   No persons appeared as witnesses at the trial who were present at the time the shots were allegedly fired, specifically including any members of the alleged crowd or occupants of the vehicle that was allegedly fired upon.

    (d)   There was no evidence presented at trial sufficient to form an inference that the Appellant fired shots which were intended to cause bodily injury or serious bodily injury to the persons present.

2. The verdict on all counts was contrary to the weight of the evidence presented at trial in that, without the testimony of persons who were present at the time the shots were allegedly fired, and without physical evidence, the testimony of the Commonwealth's witnesses, police officers who were not present at the time the shots were allegedly fired, was based on sheer speculation and incredible of belief.

3. The Trial Court erred in permitting, over the objection of the defense, Officer Joelle Mota of the Catasauqua Police Department to narrate a video presented by the Commonwealth which purportedly displayed the criminal

incident to which Officer Mota was not a witness, in that his testimony was based on speculation, not personal knowledge [Pa.R.E. 602], it contained improper lay opinion [Pa.R.E. 701], and the danger of unfair prejudice outweighed the narration's probative value [Pa.R.E. 403].

*See* Deater's Brief at 6–7 (brackets in original).

Deater's first issue is a challenge to the sufficiency of the evidence. He alleges deficiencies in the type of evidence presented at trial, which did not include any witnesses who were present at the time of the incident. *Id.* at 19. Importantly, Deater challenges the proof of his intent, claiming that a "transferred intent" theory could not apply to the facts of his case. *Id.* at 20–29. While he acknowledges that the evidence supports a finding that he "possessed and fired a handgun,"[2] he disputes that there was any evidence to support "that the gun was fired at a person" to prove his specific intent to cause injury. Deater's Reply Brief at 3.

This Court applies the following standard to review a sufficiency claim:

In reviewing a claim regarding the sufficiency of the evidence, an appellate court must determine whether the evidence was sufficient to allow the fact finder to find every element of the crimes charged beyond a reasonable doubt. In doing so, a reviewing court views all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth. Furthermore, in applying this standard, the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence. When performing its review, an

_____

[2] To the extent that Deater also challenges proof of his identity and his action, this challenge fails. The jury could find that Deater was the man in the video who moved like he was firing a gun with his right hand, then ran away with his right hand in his hoodie pocket while wearing the same shorts that Deater was wearing minutes later. The jury could find that he used live ammunition that matched the shell casings and magazines recovered.

appellate court should evaluate the entire record and all evidence received is to be considered, whether or not the trial court's rulings thereon were correct. Additionally, we note that the trier of fact, while passing on the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence.

*Commonwealth v. Burton*, 2 A.3d 598, 601 (Pa. Super. 2010) (*en banc*) (quoting *Commonwealth v. Galvin*, 985 A.2d 783, 789 (Pa. 2009)) (internal citations omitted).

The aggravated assault statute provides that a person can commit the offenses in this case either by attempting to cause or by causing a result:

A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; [or] . . .

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]

18 Pa.C.S. § 2702(a)(1), (4).

If there is no evidence that the defendant actually caused injury, the Commonwealth must prove that he attempted to do so. *Commonwealth v. Lopez*, 654 A.2d 1150, 1154 (Pa. Super. 1995) (citations omitted). "Attempt, in the context of an assault, is established when the accused intentionally acts in a manner which constitutes a substantial or significant step toward perpetrating serious bodily injury upon another." *Id.* Circumstantial evidence can prove intent, and a fact-finder "is free to conclude that the accused intended the natural and probable consequences of his actions to result therefrom." *Id.* at 1155. A person firing a gun at a person or group is

- 10 -

sufficient evidence to prove that he intended to cause injury. *See Commonwealth v. Palmer*, 192 A.3d 85, 96 (Pa. Super. 2018).

We find a useful comparison in *Palmer*, a case where surveillance video showed a man "extending his arm in a position consistent with firing a gun" as a vehicle drove by. *Id.* at 87. There, the defendant fired ten shots, one of which struck the driver of the car; there was some evidence that other people were on the street at that time. *See id.* At trial, the Commonwealth alleged that he intended to injure a "John Doe" on the street, not the driver. *Id.* at 90. The jury found the defendant guilty of aggravated assault of both the driver and of a "John Doe" victim. *Id.* at 88–89.

On appeal, we concluded that the evidence supported both aggravated assault convictions. As for the aggravated assault of the driver, we observed that the Commonwealth could sustain its burden under a transferred intent theory by proving that the defendant intended to injure someone other than the driver. *Id.* at 91–92 ("For . . . that charge, the jury was required to answer this question: was the bullet that struck [the driver] actually meant to strike another person? If so, then the intent transfers . . . ."). As for the aggravated assault of "John Doe," where there was no evidence of any injury, we observed that the Commonwealth was required to prove that the defendant had the intent to cause serious bodily injury. *Id.* at 92. Based on the evidence from trial, we concluded that the jury could find that there was a group of people (outside the vehicle) and that the defendant "fired in their

direction." **Id.** at 94.[3] This action, considered among the totality of the circumstances, was sufficient for the jury to infer that the defendant intended "to inflict serious bodily injury upon someone within that group." **Id.** at 94–96 (citing, *inter alia*, **Commonwealth v. Matthew**, 909 A.2d 1254 (Pa. 2006)).

Here, the evidence from trial was sufficient for the jury to find that Deater's gunshots were aimed at a person, and thus that he intended to cause serious bodily injury. Although there was no testimony from eyewitnesses to Deater's shooting, such testimony was not required.[4] The Commonwealth can meet its burden to prove intent with circumstantial evidence, including surveillance footage. Likewise, because the relevant sections of the aggravated assault statute can apply to attempts to cause injury, the Commonwealth was not required to also demonstrate that the gunshots reached their intended target. For both disputed counts, it is enough for the Commonwealth to prove that the defendant attempted to cause serious bodily injury and attempted to cause bodily injury with a deadly weapon.

We therefore review whether the video, in combination with the other evidence from trial, reasonably supports the finding of the disputed element.

_____

[3] Judge Ransom dissented that the evidence supported a finding that a crowd of people was present. **Palmer**, 192 A.3d at 101–03 (Ransom, J, concurring and dissenting).

[4] As the prosecutor argued to the jury, requiring eyewitness testimony would prevent many homicides from being prosecuted. N.T., 7/10/24, at 44. Of course, the law does not impose that untenable requirement.

We conclude it does. The jury could find that Deater was on the basketball court at 6:40 p.m. For the first minute of the video, the jury could find that the other people were playing basketball while Deater was pacing around the sideline. The video likewise supports a finding that the black car approached at 6:41 p.m., turned left toward the basketball court, and stopped moving 16 seconds later. From the common experience of seeing car doors, the jury could conclude from the glint of light that the car's passenger door opened 8 seconds later, at 6:41:24 p.m. These observations support the reasonable inference that the car contained a driver and a passenger.

Watching the video, the jury could find that Deater stopped pacing and stood still when the black car came into view. The video showed Deater in the same spot until shortly after the car door opened. Seconds later, the video showed that Deater bent his knees, raised his right arm, and staggered back in a line away from the black car. The basketball players reacted and scrambled away. The black car door closed, and several cars sped off from the scene. Deater and J.R. also ran—towards the camera, which captured the unique colors of Deater's shorts and showed Deater keeping his right hand in his hoodie pocket. The timing supports the inference that Deater reacted to the arrival of the people in the black car by shooting at them, and therefore that he intended to cause them serious bodily injury. A "transferred intent" theory does not apply to this case because the jury could find that Deater intended to injure the people in the car when he shot at them. Deater's first issue fails.

Deater's second issue is a challenge to the weight of the evidence. He argues that the silent surveillance footage would not permit the jury to find that he shot at a person (or intended to cause injury), that the police narration improperly influenced the trial, and the resulting verdict therefore shocks the conscience. Deater's Brief at 29; Deater's Reply Brief at 3.

We review a weight claim for an abuse of discretion, mindful of the distinct roles of the trial and appellate courts.

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Windslowe*, 158 A.3d 698, 712 (Pa. Super. 2017) (quoting *Commonwealth v. Mucci*, 143 A.3d 399, 410–11 (Pa. Super. 2016)). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or

partiality, as shown by the evidence of record." **Commonwealth v. Rogers**, 259 A.3d 539, 541 (Pa. Super. 2021) (quoting **Commonwealth v. Santos**, 176 A.3d 877, 882 (Pa. Super. 2017)).

Here, Deater argued in his post-sentence motion for a new trial and subsequent brief to the trial court that "the guilty verdict was so contrary to the weight of the evidence as to shock one's sense of justice." Post-Sentence Motions, 9/16/24, at 3–4. He explained that the victims were never identified, there was no evidence from anyone present when the shots were fired, and the verdict was based on Officer Mota's narration of the surveillance video. Brief, 12/19/24, at 2–9.

The trial court rejected Deater's motion, explaining:

> [Deater] believes the verdict is against the weight of the evidence in this case because the Commonwealth did not produce any victims at trial. I disagree.
>
> The Commonwealth presented compelling evidence of [Deater's] guilt, most notably video surveillance footage. The video shows the shooter firing multiple rounds on a crowded basketball court towards occupants of a vehicle, following which multiple people flee the area. Although [Deater's] face is not clearly shown on the video, you are able to see distinctive shorts worn by the shooter, which were the same shorts worn by [Deater] when he was taken into custody. Additionally, testing proved that the firearm found on [Deater] was the weapon that fired the shots at the park. Even absent testimony from any of the victims, it is clear that by blindly firing a weapon in a crowded public park, "the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury." **Commonwealth v. McClendon**, 874 A.2d 1223, 1229 (Pa. Super. 2005). As such, the verdict in this case does not shock the conscience, and a new trial is not warranted.

Order, 2/7/25, at 2 n.1; **accord** Trial Court Opinion, 5/28/25, at 6.

- 15 -

We discern no abuse of discretion. The trial court considered Deater's challenge against the trial evidence and determined that the verdict did not shock the court's conscience. Deater's frames his appellate argument to mirror his argument to the trial court (and his argument to the jury). What Deater does not explain is how the trial court's ruling was an abuse of discretion. For example, Deater does not contend that the trial court misapplied the law by citing a recklessness standard to assess the verdict for the specific-intent crimes at issue. Deater does not explain how the trial court's decision was manifestly unreasonable or the product of bias, prejudice, ill-will or partiality.

Rather, the trial court's decision is supported by evidence of record, including the surveillance footage of the arrival of the black car, Deater's fast response, and the immediate reaction of the other people on the basketball court, as well as the recovered shell casings and firearm. Thus, the trial court acted within its discretion, and Deater's second issue fails.

Deater's third issue is a challenge to the admission of Officer Mota's description of the surveillance videos. He argues that the officer's improper opinions exceeded the limited narration that case law allows. He claims that Officer Mota's testimony (that the person in the video, wearing the same shorts as Deater, fired at the black car, which contained at least two people) misled the jury. Deater contends this evidence violated the rules on the need for personal knowledge, the limits of a lay opinion testimony, and the danger of unfair prejudice. Deater's Brief at 43 (citing Pa.R.E. 602, 701, and 403).

Because a ruling admitting evidence "is within the sound discretion of the trial court," we review to determine whether the appellant has shown "that the trial court clearly abused its discretion." *Commonwealth v. Faison*, 297 A.3d 810, 825 (Pa. Super. 2023) (quoting *Commonwealth v. Dula*, 262 A.3d 609, 626 (Pa. Super. 2021)). Based on this standard, we will not reverse an evidentiary ruling "unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." *Commonwealth v. Huggins*, 68 A.3d 962, 966 (Pa. Super. 2013) (quoting *Commonwealth v. Minich*, 4 A.3d 1063, 1068 (Pa. Super. 2010)). "Where the evidentiary question involves a discretionary ruling, our scope of review is plenary, in that the appellate court may review the entire record in making its decision." *Id.* (quoting *Commonwealth v. Delbridge*, 859 A.2d 1254, 1257 (Pa. 2004)).

This Court reviewed the admissibility of narration of surveillance footage in *Commonwealth v. Cole*, 135 A.3d 191, 195–96 (Pa. Super. 2016). There, a detective testified that he was assigned to recover video of a homicide and reviewed footage for six hours. *Id.* at 196. He described the videos:

> During the course of his narration, Detective Satler pointed out the time stamp at various points in the video; he described the location of the cameras to the scene, the physical relationships between people and buildings, and the movements of a vehicle; he identified three men leaving an apartment and running along the fence line and the victim staggering and falling down. Using measurements he and his colleague took, the video footage, and the time stamps, Detective Satler calculated the direction, distance, and time covered by the three individuals.

- 17 -

*Id.* (record citations omitted). We rejected the defendant's challenge to the admission of this testimony. The detective had personal knowledge of what the videos showed based on his experience, perceptions, and time at the scene. *Id.* As lay opinion, the testimony was helpful to the jury's understanding. *Id.* Moreover, we concluded that the above testimony did not cause any unfair prejudice. *Id.*

Additionally, we analyzed narration of surveillance footage in *Palmer*, 192 A.3d at 99–101. There, a detective identified the defendant as the shooter based on his review of videos. *Id.* We concluded that this testimony was permissible as a lay opinion, because it was based on the detective's own perception and helped the jury understand the case. *Id.* at 101. The trial court observed that the jury remained impartial, and we agreed:

> The jury was obviously aware that the Commonwealth believed that the person was Appellant, and it was the jury's duty to determine if the Commonwealth proved that fact beyond a reasonable doubt. The jury itself watched the videos, and was free to reach a different conclusion if it disagreed with Detective Wearing's conclusion that it was Appellant depicted on the video at specific moments in the footage.

*Id.* Because the testimony complied with the rules of evidence, we found no abuse of discretion. *Id.*

Here, the trial court reasoned that Officer Mota's descriptions of the video helped the jury understand the sequence and locations of the events. Trial Court Opinion, 5/28/25, at 7. The court observed that the officer's "testimony was based on his experience, perceptions, and personal knowledge of the park." *Id.* The trial court noted "that the jury was clearly aware" of

- 18 -

what the Commonwealth believed the video showed and knew that it was up to them to determine whether the Commonwealth proved its theory of the case beyond a reasonable doubt. *Id.*

We find no abuse of discretion. For the first video, Officer Mota testified over Deater's objection that the suspect was running past the pool, towards the concert pavilion. For the second video, he testified over objection that the black car arrived from Bridge Street and parked behind a white sedan. Officer Mota stated that the car had at least two people in it, because the car was driven and the passenger door was opened for a moment. Officer Mota could give these descriptions of the location based on his experience there and his review of the footage. As in *Cole*, the officer's indications helped the jury pay attention to specific parts of the videos that were relevant to the case. And as in *Palmer*, the "jury was obviously aware" of the Commonwealth's theory but was left to decide for itself whether the suspects ran across the park, whether the black car arrived as the video depicted, and whether Deater was guilty of the charged crimes. Deater's third issue fails.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/11/2026

- 19 -